[No. 61127-5-I.   Division One.   July 6, 2009.]

THE STATE OF WASHINGTON, *Respondent,* v. TIMOTHY SEAN MARTIN, *Appellant.*

*Vanessa Mi-jo Lee* (of *Washington Appellate Project*), for appellant.

*Janice E. Ellis, Prosecuting Attorney,* and *Mary K. Webber, Deputy,* for respondent.

¶1 DWYER, J. — Today we decide whether, in the context of a prosecutor's cross-examination of a defendant concerning the defendant's opportunity to tailor his testimony to evidence previously introduced at trial, a defendant's rights to be present at trial, to testify, and to confront witnesses

pursuant to article I, section 22 of the Washington Constitution should be interpreted differently from parallel rights protected under the Sixth Amendment to the United States Constitution. We hold that, in this context, no differing interpretation is compelled. Thus, because the federal constitution permits a jury to consider a defendant's opportunity to tailor testimony, the questions posed herein were allowable. Accordingly, we affirm.

## I

¶2 Timothy Martin was charged with three counts of kidnapping in the first degree and one count of robbery in the second degree. At trial, Jessica Sobania identified Martin as the individual who forced his way into her minivan in a Marysville drugstore parking lot one night as she was seating her two young children in the backseat and who, after Sobania later escaped from the vehicle to seek help, drove off with Sobania's children still in the van. Other witnesses testified that, the following morning, police officers found Sobania's van parked at an industrial complex a few miles from where Sobania had escaped and recovered her children physically unharmed. A police detective testified that he found Sobania's purse next to Martin's photo identification and clothing in the vicinity of the industrial complex. The State's forensic DNA (deoxyribonucleic acid) expert testified that DNA samples collected from the van's steering wheel and keys found in the van matched Martin's DNA profile. He further testified that an individual must handle an item for a prolonged period of time in order to deposit a sufficient amount of DNA to allow for DNA testing, thus supporting Sobania's testimony that Martin had driven away in her van. In addition, a friend of Martin's, Gerrie Summers, testified that Martin had essentially confessed to her that he had kidnapped Sobania and her children.

¶3 After the State presented its case in chief, Martin testified in his defense. He admitted that he had entered

Sobania's van near the industrial complex. He further admitted that he had touched the steering wheel when attempting to start the vehicle and that he took Sobania's purse from the van but later discarded it along with his photo identification and clothing. However, he denied kidnapping Sobania or her children. Instead, Martin testified, he entered Sobania's van as part of an elaborate, drug-induced vehicle-prowling scheme that took him on foot throughout Marysville as he attempted to scrounge money following his release from prison a few days earlier. Martin testified that he was nowhere near the drugstore parking lot when Sobania was abducted. To support this testimony, Martin pointed to a library time log showing that, roughly an hour before Sobania was kidnapped, he was at a library approximately eight miles from the drugstore, thus inviting the jury to infer that he could not have traveled from the library to the drugstore on foot in the space of an hour. Martin also attempted to explain away Summers' damaging testimony.

¶4 Whether Martin tailored his testimony to fit the evidence introduced at trial became an issue during his testimony. On direct examination, Martin explicitly testified that he had relied on other witnesses' prior testimony to pinpoint the time when he entered Sobania's van.[1] He also confirmed on direct examination that he had been "present and heard" Summers' testimony. On cross-examination, Martin again explicitly testified that he was relying on other witnesses' testimony as to when he had entered Sobania's van.[2] The prosecutor then asked more questions drawing attention to Martin's opportunity to tailor his

---

[1] The following exchange took place between Martin and his lawyer:

Q. All right. Before I go any further, do you have any idea what time it was when you were at that location [i.e., the industrial complex where the van was found]?

A. I would guess 11:30, 12:00, 12:30 at night. From prior testimony, I know it had to be before one, because I heard people working in there, I heard lots of, you know, loud working.

VII Report of Proceedings (RP) (Dec. 11, 2007) at 28.

[2] The prosecutor and Martin engaged in the following exchange:

Q. Now, can you tell me again about what time it is you think this happened, about what time do you think you got into the van?

testimony to the evidence introduced at trial.[3] The jury subsequently convicted Martin on all counts.

---

A.   I would say my estimate, 11:30, 12:00, 12:30. Like I said, I didn't have a watch. I don't know for sure. I heard plenty of people working. I'm saying this time, because of prior testimony, that I heard, said that the shop was closed at 1:00 a.m., so it was before 1:00 a.m.

VII RP (Dec. 11, 2007) at 74.

[3] Over the objections of Martin's counsel, the prosecutor asked Martin the following:

Q.   And you've had the advantage of hearing all the testimony before you testified today, correct?
A.   Obviously I have been sitting in that seat the whole time, yes.
Q.   And you've also had the advantage of knowing what people were going to say ahead of time, wouldn't you agree with me?
A.   No, I didn't know what anybody was going to say ahead of time.
Q.   You didn't get to read the police reports?
A.   I got to read the police reports.
Q.   And you didn't get to read witness statements?
A.   I read witness statements, yes.
Q.   And you weren't allowed to bring those reports and statements with you to court?
A.   I read everything involved, yes.
Q.   And you've had what, a little over a year to concentrate on what people were going to say, didn't you?
     . . . .
A.   I have been in custody for 13 months.
Q.   That wasn't my question. My question is, you've known this was coming up for a year, correct?
A.   I thought of nothing about this, yes, I was ready to go to trial a year ago. I am not the one who made it last this long.
     . . . .
Q.   So in the pendency of this trial, you've had access of [sic] what the evidence was?
A.   I've read the police reports, I've read your discovery, yes.
Q.   And you've heard all the testimony so far?
A.   So far, yes.
Q.   And so you knew all that before you testified?
A.   Yes.
Q.   And so you knew exactly where your DNA had been found in the car?
     . . . .
Q.   Mr. Martin, you've known since April that your DNA was on the keys?
A.   Yes.
Q.   And you've known since August that your DNA was on the steering wheel, isn't that true?
A.   Yes.

VII RP (Dec. 11, 2007) at 74-75, 79, 82.

## II

¶5 Martin contends that the prosecutor's questions concerning his opportunity to tailor his testimony to the evidence introduced at trial constituted prosecutorial misconduct. Specifically, Martin asserts that the prosecutor's questions infringed his rights under article I, section 22 of the Washington Constitution to be present at trial, to meet witnesses face to face, and to testify in his behalf.[4] We disagree.

¶6 To prevail on a claim of prosecutorial misconduct, the defendant must show both improper conduct and prejudicial effect. *State v. Roberts*, 142 Wn.2d 471, 533, 14 P.3d 713 (2000). " '[T]he State can take no action which will unnecessarily chill or penalize the assertion of a constitutional right and the State may not draw adverse inferences from the exercise of a constitutional right.' " *State v. Gregory*, 158 Wn.2d 759, 806, 147 P.3d 1201 (2006) (alteration in original) (internal quotation marks omitted) (quoting *State v. Rupe*, 101 Wn.2d 664, 705, 683 P.2d 571 (1984)). A prosecutor may, however, touch upon a defendant's exercise of a constitutional right, provided the prosecutor does not " 'manifestly intend[ ] the remarks to be a comment on that right.' " *Gregory*, 158 Wn.2d at 806-07 (quoting *State v. Crane*, 116 Wn.2d 315, 331, 804 P.2d 10 (1991)).

¶7 Martin recognizes that the United States Supreme Court's decision in *Portuondo v. Agard*, 529 U.S. 61, 120 S. Ct. 1119, 146 L. Ed. 2d 47 (2000), precludes him from arguing that the prosecutor's questions violated his rights under the Sixth Amendment to the United States Constitution to be present at trial, to confront witnesses, and to

---

[4] Article I, section 22 of the Washington Constitution provides, in pertinent part:

In criminal prosecutions the accused shall have the right to appear and defend in person, . . . to testify in his own behalf, [and] to meet the witnesses against him face to face.

testify in his own defense. Instead, he offers a *Gunwall*[5] analysis in support of his claim that article I, section 22 should be independently interpreted more favorably to him than the Sixth Amendment. Before we consider Martin's argument, however, we must analyze the *Portuondo* decision to discern the nature of a defendant's Sixth Amendment rights in this context, thus illuminating the issues arising in a *Gunwall* analysis of article I, section 22. *See State v. Foster*, 135 Wn. 2d 441, 456, 957 P.2d 712 (1998) (plurality opinion) (discussing scope of federal right of confrontation before embarking on *Gunwall* analysis).

¶8 In *Portuondo*, the Court held that a prosecutor does not violate a defendant's Sixth Amendment rights to be present at trial, to confront adverse witnesses, and to testify by commenting on the defendant's opportunity to tailor his or her testimony to the evidence previously introduced at trial. The prosecutor in *Portuondo* remarked during closing argument that the defendant, Agard, had an advantage over other witnesses because he had had the opportunity to observe the other witnesses' testimony before he testified and, thus, could tailor his testimony to the evidence previously introduced. 529 U.S. at 64. The Court explained that "[t]he prosecutor's comments . . . concerned [Agard's] *credibility as a witness*, and were therefore in accord with our longstanding rule that when a defendant takes the stand, 'his credibility may be impeached and his testimony assailed like that of any other witness.'" *Portuondo*, 529 U.S. at 69 (quoting *Brown v. United States*, 356 U.S. 148, 154, 78 S. Ct. 622, 2 L. Ed. 2d 589 (1958)). The Court further observed that "'the rules that generally apply to other witnesses—rules that serve the truth-seeking function of the trial—are generally applicable to [a testifying defendant] as well.'" *Portuondo*, 529 U.S. at 69 (quoting *Perry v. Leeke*, 488 U.S. 272, 282, 109 S. Ct. 594, 102 L. Ed. 2d 624 (1989) and citing *Reagan v. United States*, 157 U.S. 301, 305, 15 S. Ct. 610, 39 L. Ed. 709 (1895)).

---

[5] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).

¶9 In holding that the prosecutor's comments did not violate Agard's Sixth Amendment rights, the Court in *Portuondo* contrasted a prosecutor's comment on a defendant's credibility, based on the opportunity to tailor testimony, with a prosecutor's comment urging the jury to draw a negative inference of guilt from the defendant's refusal to testify. The latter type of comment, "by 'solemnizing the silence of the accused into evidence against him,' unconstitutionally 'cuts down on the privilege [against self-incrimination] by making its assertion costly.' " *Portuondo*, 529 U.S. at 65 (alterations in original) (quoting *Griffin v. California*, 380 U.S. 609, 614, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965)). In essence, a comment that the jury should find a defendant guilty because he remained silent amounts to "urging the jury to do . . . something *the jury is not permitted to do.*" *Portuondo*, 529 U.S. at 67. Thus, a prosecutor is "prohibited [from making] comments that suggest a defendant's silence is 'evidence of *guilt.*' " *Portuondo*, 529 U.S. at 69 (quoting *Griffin*, 380 U.S. at 615). In addition, "the inference of guilt from silence is not always 'natural or irresistible,' " thus making effective a jury instruction that a defendant's guilt may not be inferred from his silence. *Portuondo*, 529 U.S. at 67 (quoting *Griffin*, 380 U.S. at 615). On the other hand, the Court explained, "it *is* natural and irresistible for a jury, in evaluating the relative credibility of a defendant who testifies last, to have in mind and weigh in the balance the fact that he heard the testimony of all those who preceded him." *Portuondo*, 529 U.S. at 67-68.

¶10 Further, the Court rejected the argument that it is impermissible for a prosecutor to generally comment that a defendant had the opportunity to tailor testimony. *Portuondo*, 529 U.S. at 70. Such general comments are permissible because, similar to jury instructions on witness bias, they "set forth a consideration the jury was to have in mind when assessing the defendant's credibility, which, *in turn*, assisted it in determining the guilt of the defendant." *Portuondo*, 529 U.S. at 71. In summarizing its reasoning that the Sixth Amendment does not preclude a prosecutor

from drawing attention to a defendant's opportunity to tailor testimony, the Court explained that there was

> no reason to depart from the practice of treating testifying defendants the same as other witnesses. A witness's ability to hear prior testimony and to tailor his account accordingly, and the threat that ability presents to the integrity of the trial, are no different when it is the defendant doing the listening. Allowing comment upon the fact that a defendant's presence in the courtroom provides him a unique opportunity to tailor his testimony is appropriate—and indeed, given the inability to sequester the defendant, sometimes essential—to the central function of the trial, which is to discover the truth.

*Portuondo*, 529 U.S. at 73.

¶11 The questions that the prosecutor asked Martin on cross-examination are substantively indistinguishable from the comments at issue in *Portuondo*. Therefore, under the holding in *Portuondo*, the prosecutor herein did not violate Martin's Sixth Amendment rights to attend trial, to confront witnesses, or to testify in his own defense.

¶12 Martin attempts to escape the effect of *Portuondo* by arguing that, in light of the analytical framework established in *Gunwall*, his trial rights under article I, section 22 of the Washington Constitution should be interpreted independently and more broadly than his parallel rights under the Sixth Amendment. In determining whether the Washington State Constitution "should be considered as extending broader rights to its citizens than does the United States Constitution," we consider the following nonexclusive criteria: (1) the textual language of the state constitution, (2) significant differences in the texts of parallel provisions of the federal and state constitutions, (3) state constitutional and common law history, (4) preexisting state law, (5) differences in structure between the federal and state constitutions, and (6) whether the matter is of particular state interest. *Gunwall*, 106 Wn.2d at 61-62.

¶13 The court in *Gunwall* identified these criteria, in part, to ensure that consideration of independent state law

grounds "will be made for well founded legal reasons and not by merely substituting our notion of justice for that of duly elected legislative bodies or the United States Supreme Court." 106 Wn.2d at 62-63. The court criticized the practice of state courts "resorting to state constitutions rather than to analogous provisions of the United States Constitution [and] simply announc[ing] that their decision is based on the state constitution but . . . not further explain[ing] it." *Gunwall*, 106 Wn.2d at 60. In developing a mode of legal analysis to give distinct vitality to the state constitution, the court chided the practice of relying on state constitutional provisions, without more, to reach results differing from those of cases interpreting parallel federal constitutional provisions. It observed that "[t]he difficulty with such decisions is that they establish no principled basis for repudiating federal precedent and thus furnish little or no rational basis for counsel to predict the future course of state decisional law." *Gunwall*, 106 Wn.2d at 60. Analysis within this neutral framework helps to "achieve a balanced and complete development of the issue and avoid baseless, result-oriented jurisprudence." *State v. Silva*, 107 Wn. App. 605, 614, 27 P.3d 663 (2001) (citing Hugh D. Spitzer, *Which Constitution? Eleven Years of Gunwall in Washington State*, 21 SEATTLE U. L. REV. 1187, 1205 (1998)). Stated differently, by consistently considering neutral criteria in determining whether the protective scope of parallel federal and state constitutional provisions differ, courts can avoid unprincipled decisions that suffer from the arbitrary ascription of different meaning to substantially similar language.

¶14 *Gunwall* itself provides guidance about when an independent state constitutional analysis is warranted. At issue in *Gunwall* was whether article I, section 7 of the Washington Constitution[6] required the police to first obtain a search warrant before obtaining long-distance telephone

---

[6] Article I, section 7 of the Washington Constitution provides, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

call records and before placing a pen register on the suspect's phone. 106 Wn.2d at 58. The court recognized that the United States Supreme Court, in *Smith v. Maryland*, 442 U.S. 735, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979), had held that the Fourth Amendment did not require police to obtain a warrant to install a pen register and that other courts had held that the Fourth Amendment likewise did not require police to obtain a warrant to obtain long-distance billing records. *Gunwall*, 106 Wn.2d at 64. The *Gunwall* court concluded, however, that article I, section 7 protects individual privacy in this context more expansively than does the Fourth Amendment. Of great significance was that article I, section 7, unlike the Fourth Amendment, expressly protects an individual's "private affairs." *Gunwall*, 106 Wn.2d at 65. The court also found it noteworthy that the State Constitutional Convention of 1889 rejected a "proposal to adopt language identical to that of the Fourth Amendment." *Gunwall*, 106 Wn.2d at 66. Further, the court noted that Washington's "long history and tradition of strict legislative protection of telephonic and other electronic communications," including statutes criminalizing the wrongful interception of such communications, "len[t] strong support to [its] decision to resort to independent state constitutional grounds in this case." *Gunwall*, 106 Wn.2d at 66. The court also characterized telephonic communication as a " 'necessary component of modern life . . . indispensable to one's ability to effectively communicate in today's complex society.' " *Gunwall*, 106 Wn.2d at 67 (quoting *People v. Sporleder*, 666 P.2d 135, 141 (Colo. 1983)).[7]

■ ■ ¶15 The provisions of article I, section 22 implicated in this case, however, do not warrant an analysis independent from the Sixth Amendment.

---

[7] Since the court decided *Gunwall*, it has determined that the Washington Constitution provides greater protection of individual's privacy rights in other contexts as well. *See, e.g., City of Seattle v. Mesiani*, 110 Wn.2d 454, 755 P.2d 775 (1988) (sobriety checkpoint); *State v. Boland*, 115 Wn.2d 571, 800 P.2d 1112 (1990) (garbage searches); *State v. Young*, 123 Wn.2d 173, 867 P.2d 593 (1994) (infrared thermal searches); *State v. Hendrickson*, 129 Wn.2d 61, 917 P.2d 563 (1996) (investigative searches).

¶16 The first two *Gunwall* factors—the text of the state constitution and significant textual differences between the parallel state and federal constitutional provisions—do not support an independent analysis. Pursuant to article I, section 22, "[i]n criminal prosecutions the accused shall have the right to appear and defend in person, . . . to testify in his own behalf, [and] to meet the witnesses against him face to face." The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, . . . to be confronted with the witnesses against him[, and] to have compulsory process for obtaining witnesses in his favor." The significant textual difference between these provisions is that the Sixth Amendment does not expressly guarantee the defendant the right to attend trial and to testify as does article I, section 22. But the Sixth Amendment has been interpreted as necessarily guaranteeing these rights. *See Rock v. Arkansas*, 483 U.S. 44, 52, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987) (recognizing defendant's right to testify); *Illinois v. Allen*, 397 U.S. 337, 338, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970) (recognizing defendant's right to attend trial) (citing *Lewis v. United States*, 146 U.S. 370, 13 S. Ct. 136, 36 L. Ed. 1011 (1892)).

¶17 Martin attempts to make much of the express guaranty of the right to testify in article I, section 22 and the absence of a corresponding express guaranty in the Sixth Amendment. This distinction is of no moment. That the state constitution expressly guarantees that which the Sixth Amendment impliedly protects has no effect on the content of the rights protected under the parallel constitutional provisions. Nothing in the language of article I, section 22 suggests that the right to testify under the state constitution carries with it immunity from questions about the opportunity to tailor one's testimony. Unlike article I, section 7's language expressly protecting one's "private affairs," which was central to the court's decision in *Gunwall*, there is nothing in the language of article I, section 22 to suggest that the defendant's rights, as set

forth therein, are any different from those protected by the Sixth Amendment. Martin has simply identified a distinction without a difference.

¶18 Martin principally relies on *Foster* for the proposition that the textual differences between article I, section 22 and the Sixth Amendment require an independent analysis. In *Foster*, the court addressed the question of whether a state statute permitting child-abuse victims to testify via one-way, closed-circuit television under certain conditions violated a criminal defendant's right under article I, section 22 "to meet the witnesses against him *face to face*." (Emphasis added.) Thus, *Foster* concerned the *manner* in which a criminal defendant has a right to confront witnesses. 135 Wn.2d at 483 (Johnson, J., dissenting). Although the court upheld the statute, five justices (one concurring and four dissenting) agreed that, in light of the *Gunwall* factors, the confrontation clause of article I, section 22 should be analyzed independently of the confrontation clause in the Sixth Amendment. *Foster*, 135 Wn.2d at 473-74 (Alexander, J., concurring in part, dissenting in part), 481 (Johnson, J., dissenting); *see also State v. Shafer*, 156 Wn.2d 381, 391, 128 P.3d 87 (2006) (recognizing that a majority of justices in *Foster* agreed that the state confrontation clause should be interpreted independently from the Sixth Amendment); *State v. Smith*, 148 Wn.2d 122, 131, 59 P.3d 74 (2002) (same).

¶19 Martin misreads *Foster* as establishing the principle that, whenever there arises an issue concerning one of the many protections that article I, section 22 affords a criminal defendant, we must analyze the particular right or rights in question separately from any parallel federal provision. However, *Foster* does not stand for the proposition that article I, section 22, in its entirety, must always be interpreted independently of the Sixth Amendment. Rather, as we have previously observed, *Foster* concerned only one of the rights that an accused enjoys under the bundle of protections afforded by article I, section 22. *See State v. Mason*, 127 Wn. App. 554, 569, 126 P.3d 34 (2005) (explain-

ing, in the context of a challenge to the admission of hearsay evidence, that "*Foster* did not establish a firmly-rooted principle of state constitutional jurisprudence, as it discussed only the constitutional provisions in a context entirely distinct from the one presented here"), *aff'd on other grounds*, 160 Wn.2d 910, 162 P.3d 396 (2007), *cert. denied*, 553 U.S. 1035 (2008); *Silva*, 107 Wn. App. at 613 (observing that "Washington courts have not yet interpreted article I, section 22 relating to an accused's right of access to the courts").

¶20 The recognition of a majority of the justices in *Foster* that, in the context of the issue therein presented, the confrontation clause in the state constitution warranted an independent analysis is not controlling in this instance. Simply put, the two cases do not involve the same issues. Unlike in *Foster*, the issue here is not whether the manner in which Martin confronted witnesses at trial satisfied the requirements of the confrontation clause in article I, section 22. Instead, the issue here is whether Martin's right to observe the State's case in its entirety shields him from a prosecutor's questions concerning the opportunity thus presented to tailor his testimony. Whether article I, section 22 requires that a defendant be able to confront a witness in person instead of via closed-circuit television has no bearing on the determination of whether a defendant's state constitutional trial rights provide a larger measure of protection against tailoring inquiries than does the Sixth Amendment. *Foster* is ultimately of little relevance to this case.

¶21 With respect to the third *Gunwall* factor—state constitutional and common law history—Martin contends that legal history cuts in favor of an independent and more expansive interpretation of his rights under article I, section 22. He emphasizes that the State Constitutional Convention adopted language for article I, section 22 at variance with the Sixth Amendment. In so doing, Martin posits, the convention intended the rights at issue to guarantee protections that differ from those afforded by the Sixth

Amendment. His argument rests largely on the commentary of a former Washington Supreme Court justice, who argued that "state bills of rights were never intended to be . . . interpreted in light of the United States Bill of Rights" both because many early states adopted individual rights charters before the United States Constitution was ratified and because "Washington, like the vast majority of relatively newer states, copied much of its Declaration of Rights from the constitutions of older states, rather than from the federal charter." Robert F. Utter, *Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights*, 7 U. PUGET SOUND L. REV. 491, 496-97 (1984).

¶22 Legal history, however, contributes little to resolving the issue before us. As courts have noted and Martin himself recognizes, little historical evidence exists concerning the intentions of the individuals who drafted and adopted the Washington Constitution. *See, e.g., Foster*, 135 Wn.2d at 460 (plurality opinion); *Silva*, 107 Wn. App. at 619. *The Journal of the Washington State Constitutional Convention, 1889* provides no clue as to whether the drafters of article I, section 22, by explicitly recognizing the rights here at issue, sought to shield a testifying defendant from questions about the opportunity to tailor testimony and thereby treat the testifying defendant differently from other witnesses. The *Journal* contains only the text of the adopted provision and notes the date on which the Convention reviewed the language: July 30, 1889. The minutes from that day of debate likewise provide no insight. *See* THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION 1889, at 510-12, 511 n.38, 191-96 (Beverly Paulik Rosenow ed., William S. Hein & Co. 1999) (1962) (hereinafter JOURNAL). The *Journal* simply notes that article I, section 22, as originally adopted, was "identical" to parallel provisions in the Indiana and Oregon constitutions and that it was "similar" to the Sixth Amendment. JOURNAL, *supra*, at 511 n.37. Nor does the leading treatise on state constitutional law shed light on this question. *See* ROBERT F. UTTER & HUGH

D. Spitzer, The Washington State Constitution: A Reference Guide 22-24, 35-37 (2002) (discussing rights of accused persons).

¶23 In addition, Martin points to nothing in the common law supporting an independent state constitutional analysis. Although Martin cites cases decided by courts in Indiana and Oregon, whose constitutions served as a model for article I, section 22, none of these cases deals with the issue at hand. Instead, like *Foster*, they concern the manner of confrontation. Martin is correct that a criminal defendant's right to testify was unknown to the common law and did not emerge until the mid-nineteenth century, first through state constitutions and statutory enactments and then by federal statute in 1878. *See Ferguson v. Georgia*, 365 U.S. 570, 573-83, 81 S. Ct. 756, 5 L. Ed. 2d 783 (1961). It is also true that when article I, section 22 was adopted, the Sixth Amendment had yet to be interpreted as implicitly guaranteeing the right to testify. *See Rock*, 483 U.S. at 51-53. However, that recognition of a federal constitutional right to testify developed slowly does not weigh in favor of an independent analysis of article I, section 22 in this context. Nothing suggests that the stuttering evolution of a defendant's right to testify makes the content of the pertinent rights under article I, section 22 any different from those parallel rights protected under the Sixth Amendment. Without a more detailed historical record indicating a substantive difference between the parallel state and federal provisions, Martin's argument about original intent gains little purchase. The dearth of legal history relevant to the issue before us neutralizes the third *Gunwall* factor.

¶24 The fourth *Gunwall* factor—preexisting state law—likewise does not support an independent analysis. There is no law that restricts a prosecutor from asking a defendant about the opportunity to tailor testimony.[8] On the contrary,

---

[8] We note that this court, in *State v. Johnson*, 80 Wn. App. 337, 341, 908 P.2d 900 (1996), held that "[t]he prosecutor's comments [made during closing argument] about the defendant's unique opportunity to be present at trial and hear all the testimony against him impermissibly infringed his exercise of his *Sixth*

under our precedent, a testifying defendant is to be treated the same as any other witness for purposes of cross-examination and credibility challenges. *See, e.g., State v. Etheridge*, 74 Wn.2d 102, 113, 443 P.2d 536 (1968); *cf. Geders v. United States*, 425 U.S. 80, 87, 96 S. Ct. 1330, 47 L. Ed. 2d 592 (1976) (explaining the sequestration rule, which does not apply to a defendant, "exercises a restraint on witnesses 'tailoring' their testimony to that of earlier witnesses"). In short, there is no preexisting state law that suggests we should interpret article I, section 22 independently in the context presented.

¶25 Courts have acknowledged that the fifth *Gunwall* factor—structural differences—supports an independent analysis of the state constitution and that consideration of this factor is the same in every case. *Foster*, 135 Wn.2d at 458 (plurality opinion). That is, "the United States Constitution is a *grant* of limited power to the federal government, while the state constitution imposes *limitations* on the otherwise plenary power of the state." *Foster*, 135 Wn.2d at 458-59. But this difference is a nonfactor here. How differences in the sources of government power and limitations on that power affect the content of the rights at issue here is not readily apparent. Martin makes no effort to explain the significance of this factor other than to parrot the observation that it always cuts in favor of an independent analysis.

¶26 Nor does the sixth *Gunwall* factor weigh in favor of an independent analysis. Nothing suggests that Washington has a particular concern in limiting the kinds of questions asked by the prosecutor herein. No preexisting state laws reflect a tradition of restricting prosecutorial queries of this type. Of course, it might be argued that every

*Amendment* rights to be present at trial and confront witnesses" (emphasis added). In *State v. Smith*, 82 Wn. App. 327, 334-35, 917 P.2d 1108 (1996), we embraced the reasoning in *Johnson* but held that tailoring queries on cross-examination were not violative of a defendant's Sixth Amendment rights per se. We subsequently recognized that "*Portuondo* effectively overrules *Johnson* and *Smith* insofar as they state a different rule." *State v. Miller*, 110 Wn. App. 283, 285, 40 P.3d 692 (2002). *Johnson, Smith,* and *Miller* did not, however, address tailoring queries in the context of article I, section 22.

provision of the state constitution is a matter of particular state concern. But if that were, by itself, reason to embark on an independent analysis, the entire *Gunwall* framework would be rendered superfluous.

¶27 Without any reason under *Gunwall* to analyze article I, section 22 independently from the Sixth Amendment, *Portuondo* is controlling. As the Court in *Portuondo* explained, it is both permissible and irresistible for the jury, in assessing a testifying defendant's credibility, to consider the defendant's opportunity to observe the evidence introduced at trial. Were we to hold, as Martin urges, that a prosecutor's questions about a defendant's opportunity to tailor testimony constitute a per se violation of a defendant's rights under article I, section 22, the logical next step would be to require trial courts to instruct members of the jury that they are not permitted to consider the defendant's access to the evidence introduced at trial. But such a rule would be at odds with the principle that a defendant, by testifying, exposes himself to credibility challenges as does any other witness.[9] Because it is permissible for the jury to evaluate a defendant's credibility by considering his opportunity to tailor his testimony, a prosecutor may draw attention to the defendant's opportunity to do so on cross-examination in order to impeach the defendant's credibility. Such questions do not constitute an improper comment on a defendant's exercise of his constitutional rights because they do not point to the exercise of his rights as evidence of guilt. Therefore, the prosecutor in this case did not engage in any misconduct by asking Martin about his opportunity to tailor his testimony to the evidence previously introduced at trial.[10]

---

[9] Martin's counsel conceded at oral argument that nothing requires the issuance of such an instruction to the jury.

[10] Martin also asks us to exercise our inherent authority to prescribe rules of procedure and practice to fashion a rule barring prosecutors from posing the kinds of questions that the prosecutor asked Martin at trial. He points to courts in other jurisdictions that have done so. *See, e.g., Commonwealth v. Gaudette,* 441 Mass. 762, 808 N.E.2d 798 (2004); *State v. Daniels,* 182 N.J. 80, 861 A.2d 808 (2004); *State v. Mayhorn,* 720 N.W.2d 776 (Minn. 2006). Because we find no constitutional

¶28 Affirmed.

SCHINDLER, C.J., and AGID, J., concur.

Reconsideration denied August 12, 2009.

Review granted at 168 Wn.2d 1006 (2010).

infirmity in the prosecutor's questions, there is no principled basis on which to fashion the rule that Martin seeks. Accordingly, we decline the invitation.