# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 76517-5-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| ALFRED VICTOR APODACA, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: January 14, 2019 |

2019 JAN 14 AH 9: 31

COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED

MANN, A.C.J. — Alfred Apodaca appeals his conviction for assault in the second degree. Apodaca argues that his counsel was ineffective for not objecting to the admission of booking photos in a photomontage. Apodaca also alleges that the prosecutor disparaged defense counsel during closing argument by accusing defense counsel of providing jurors with "misinformation" and coaching Apodaca's testimony.

We affirm.

I.

On September 14, 2016, off-duty Renton Police Officer, Christopher Cramer, was in the Fry's Electronics' parking lot, and saw an altercation between a man and a woman from about 50 feet away. Cramer called 911 and took down the license plate of a red Chevrolet Blazer associated with the couple. Cramer described the woman as

wearing a red shirt with her hair styled in a bun. Cramer described the man as Caucasian with long brown hair and a beard. Before uniformed officers arrived, the couple left together in the Blazer. The license plate listed Apodaca as the registered owner.

At approximately 9:00 p.m., Megan Wolfe called her close friend, Sherrie Buller. Wolfe was hysterical and asked Buller to come pick her up. Wolfe did not know where she was, explaining that "Al" had thrown her out of the car at the Fry's Electronics in downtown Renton, after punching and choking her. Wolfe said that Al was "after her" and she was hiding in a ditch. Buller stayed on the phone with Wolfe, asking her to find a landmark so Buller could come get her. Eventually, Wolfe identified the Wonderland Estates mobile home park on Maple Valley Highway, and Buller drove to that location to get her. Wolfe walked four miles from the Fry's Electronics to the Wonderland Estates.

When Buller found Wolfe at the mobile home park, Buller noticed bruising on Wolfe's arms and neck, and swelling and bruising on her face. Buller also noted "finger marks" on both sides of Wolfe's throat. Buller drove Wolfe to Valley Medical Center, calling 911 on the way. While Buller and Wolfe were at the hospital, Buller saw incoming text messages from someone named "Alfred" on Wolfe's cell phone.

Renton Police Officers Dennis Moynihan and Jacob Thielman responded to Valley Medical Center. Moynihan noted that Wolfe was walking with a limp, holding her rib cage, wincing in pain, and had bruising on her neck. Moynihan also noted that Wolfe was wearing a pink shirt, had brown hair, styled in a bun, and that he recognized the description from earlier in the evening when he was dispatched to Fry's Electronics.

Initially, Wolfe explained that her injuries were from an accidental fall that occurred at her new boyfriend "Al's" house—not Apodaca, her old boyfriend. When Moynihan pressed Wolfe for more information about Apodaca, she became fearful and looked away, refusing to answer questions. Moynihan told Wolfe that Apodaca may be arrested, and Wolfe became "hysterical." While Wolfe was giving the officers her statement, she and Buller had an argument because Buller was upset that Wolfe was not cooperating with the officers. Buller believed that Apodaca assaulted Wolfe because she had never heard of a new boyfriend. After providing an initial statement, Wolfe abruptly left the hospital without completing treatment.

On September 16, 2016, Officer Cramer was shown a photomontage of six men with long dark hair and beards, to pick the man he saw in the Fry's Electronics' parking lot, but Cramer did not select Apodaca. The photomontage was compiled from six booking photographs from the South Correctional Entity Regional Jail, or "SCORE jail," as it was referred to in testimony.

On September 20, 2016, Wolfe called Buller, asking to be picked up from a 7-Eleven near Apodaca's residence. Buller noted new bruises on Wolfe's neck and fresh finger impressions. Buller drove Wolfe to the police station where her injuries were documented. Officer Moynihan and Thielman indicated that during this interaction with Wolfe, she was more forthcoming and told them that "Al" was Alfred Apodaca, and he assaulted her on September 14th and 20th.

Apodaca was later arrested. The State charged Apodaca with four domestic violence felony crimes and two domestic violence aggravators based on allegedly strangling and punching Wolfe on September 14, and September 20, 2016.

The jury found Apodaca guilty of assault in the second degree, and felony violation of a court order, related to the September 14th incident. The jury acquitted Apodaca of the charges related to September 20th, and found the crimes did not involve domestic violence. The court granted the State's motion to vacate the felony violation of a court order, due to double jeopardy concerns. The court sentenced Apodaca to 43 months. Apodaca appeals.

## II.

Apodaca argues first that he received ineffective assistance of counsel. We disagree.

## A.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In Strickland, the Supreme Court set forth the prevailing standard for reversal of criminal convictions based on ineffective assistance of counsel. State v. Grier, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). Ineffective assistance is a two-pronged inquiry: a defendant must first show that counsel's performance was deficient, and second, that the deficient performance prejudiced the defendant. Strickland, 466 U.S. at 687.

To show that counsel's performance was deficient, a defendant must demonstrate that representation fell "below an objective standard of reasonableness." Strickland, 466 U.S. at 688 ("[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms"). "The threshold for deficient performance is high, given the deference afforded to decisions of defense

counsel in the course of representation." <u>Grier</u>, 171 Wn.2d at 33. A defendant must overcome "a strong presumption that counsel's performance was reasonable." <u>State v. Kyllo</u>, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). "When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient." <u>Kyllo</u>, 166 Wn.2d at 863. "Conversely, a criminal defendant can rebut the presumption of reasonable performance by demonstrating that 'there is no conceivable legitimate tactic explaining counsel's performance.'" <u>Grier</u>, 171 Wn.2d at 33 (quoting <u>State v. Reichenbach</u>, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).

A defendant arguing that his counsel was deficient based on the failure to challenge the admission of evidence must show (1) an absence of legitimate strategic or tactical reasons supporting the challenged conduct, (2) that an objection to the evidence would likely have been sustained, and (3) that the result of the trial would have been different had the evidence not been admitted. <u>State v. Saunders</u>, 91 Wn. App. 575, 578, 958 P.2d 364 (1998) (citations omitted). "Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal." <u>State v. Madison</u>, 53 Wn. App. 754, 763, 770 P.2d 662 (1989) (citations omitted).

"To satisfy the prejudice prong of the <u>Strickland</u> test, the defendant must establish that 'there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different.'" <u>Grier</u>, 171 Wn.2d at 34 (quoting <u>Kyllo</u>, 166 Wn.2d at 862)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694.

B.

Apodaca argues that his counsel was ineffective for failing to object to testimony that the photomontage was created using booking photos that informed the jury that Apodaca had previously been in jail. Apodaca argues his counsel should have objected to this evidence, sought to limit its admission, or otherwise attempted to prevent its consideration.

During cross-examination of Officer Thielman, defense counsel introduced the subject of the photomontage by asking Thielman "how did you create that montage?" After referring to his report, Thielman explained:

> So in my report I say I contacted SCORE jail, because the SCORE jail, they can create a montage of people that have been booked into SCORE jail a lot quicker than we can as a police department. They use booking photos while we use Washington DOL photos and we don't have access to every single one.
>
> So I contacted SCORE and requested they create a photomontage with Apodaca in it.

Thielman then explained that he had prepared the montage to show Officer Cramer, the off-duty officer who had witnessed the September 14, 2016, altercation in the Fry's parking lot and called 911. Thielman then confirmed that Officer Cramer had reviewed the photomontage and did not identify Apodaca as the man he had seen.

On re-direct examination, the State questioned Officer Thielman further about the montage and asked "[a]re there photos in there of the montage that you got from SCORE?" Thielman answered "[y]es there are." The State followed up asking "[a]re

those photos are they a fair and accurate depiction of the montage that SCORE sent to you?" Thielman confirmed "yes."

During the subsequent direct examination of Officer Cramer, the State offered the photomontage packet. The packet included the Renton Police Department Montage Report, filled out by Officer Cramer, indicating that he viewed the montage, chose the person in photograph one, and described the alleged incident and location. Also included were the six pictures that Officer Cramer viewed. The defense only objected to the last two pages of the packet, which included an additional copy of all six men on one page and a page that listed the name of each person pictured and an identifying number. The packet was admitted without the last two pages.

The State asked Officer Cramer to explain why he chose the person in photograph number one, and the following exchange occurred:

> [Officer Cramer]: He looked like—the most like the person that I saw that day.
> [Prosecutor]: Most like the person?
> [Officer Cramer]: Yes.
> [Prosecutor]: And what was it, were there specific features of the person that you thought made him look most like the person that you saw at Fry's?
> [Officer Cramer]: It was the amount of hair and facial hair.

On re-cross examination, defense counsel emphasized that the description of a white man with a beard and long hair is not an unusual looking person:

> [Defense Counsel]: Now on the photomontage you said the person in picture number 1 has the same facial hair and facial structure and appears to be the same person who was involved in a domestic violence incident.
> So you are choosing that person in the person number 1, in picture number 1? Correct?
> [Officer Thielman]: Correct.

. . .

      [Defense Counsel]: Would it be fair to say that there are many people in the world who would match a description of a white male with a beard and long hair?

      [Officer Thielman]: That is correct.

During closing argument, the defense emphasized that Officer Cramer did not identify Apodaca:

      [The prosecutor] talked to you about Office Cramer and tried to really not—to make light. To not make important the fact that Officer Cramer didn't pick Mr. Apodaca out of the photo montage.

      Well you can bet that if Officer Cramer had picked him out, his argument would have been just the opposite.

      He is a trained police officer. He can observe really closely.

      He picked the right person.

      The reality is he did not pick Mr. Apodaca out of the montage. And if you think back on Officer Cramer's testimony, one of the things he said is that he was sitting and observing and he said the couple drove off together. That is not what other witnesses are saying. That is not what Megan said. Megan said she walked over 4 1/2 miles to the Wonderland Estates.

Reviewing the testimony of officers Thielman and Cramer, and defense counsel's use of that evidence in closing, Apodaca has failed to meet the high burden of demonstrating that defense counsel's performance was not a legitimate trial strategy. Kyllo, 166 Wn.2d at 863.

At the outset, evidence of how the photomontage was created was introduced first by the defense—not the State. The photomontage was not offered nor admitted as other crimes, wrongs, or acts, to prove that Apodaca acted in conformity with those acts. See ER 404(b). Neither the State nor defense elicited testimony that Apodaca had previously been jailed or convicted of any crime. Instead, it appears defense counsel introduced the photomontage in order to emphasize that Officer Cramer was unable to identify Apodaca, casting doubt on whether Apodaca had ever been in the

Fry's Electronics' parking lot. The defense also emphasized that a white man with long hair and a beard is not an unusual characteristic, and made a point to reference each photograph in her re-cross of Officer Cramer. While this strategy was unsuccessful, we do not use hindsight to second guess the strategies of defense attorneys. Strickland, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

Because we conclude that Apodaca failed to carry his burden of showing an absence of a legitimate strategic or tactical reason supporting the challenged conduct, we hold that Apodaca's ineffective assistance of counsel claim is without merit.

III.

Apodaca next alleges the prosecutor committed misconduct during the State's rebuttal closing argument by disparaging defense counsel and alleging that defense counsel coached Apodaca's testimony. We disagree.

A.

We review allegations of prosecutorial misconduct for an abuse of discretion. State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014). A defendant alleging prosecutorial misconduct must show that the prosecutor's actions were improper and prejudicial. State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008). We review claims of prosecutorial misconduct "in the context of the entire case." State v. Thorgerson, 172 Wn.2d 438, 443, 258 P.3d 43 (2011) (citation omitted). Prosecutors have wide latitude during closing argument "to argue reasonable inferences from the

evidence, including evidence respecting the credibility of witnesses." Thorgerson, 172 Wn.2d at 448. This applies equally to the credibility of defendants who choose to testify. State v. Copeland, 130 Wn.2d 244, 291, 922 P.2d 1304 (1996).

B.

The State called sexual assault nurse examiner, Terri Stewart, to testify regarding her specialized knowledge of strangulation cases. Stewart did not examine Wolfe and instead relied on Wolfe's statement, police reports, and medical records to form her opinion.[1] Stewart indicated that Wolfe's injuries were consistent with strangulation and inconsistent with an injury caused by falling. Stewart opined that domestic violence victims are sometimes fearful of making police reports, and thus initial inconsistent statements are not uncommon. Stewart also indicated that sometimes, trauma patients cannot initially provide a clear history of abuse.

In discussing Stewart's experience, the following exchange occurred:

> [Prosecutor]: Are you able to ballpark how many [sexual assault cases] you review on let's say a monthly or even a yearly basis? [objection by defense, sustained]
> [Stewart]: We see—roughly 500 patients per year come through our program. About 150 decline or are not eligible for an exam based on timing, so the nurses are seeing somewhere in the neighborhood of 350 to 400 patients per year. [. . .]
> [Prosecutor]: How many cases have you been involved in where you have been asked to review police reports and medical records on the topic of strangulation?
> [Stewart]: Well, I believe I am getting close to about 10. I have some that are still pending, so I have reviewed them but haven't yet gone to court on those.

---

[1] Wolfe did not testify at trial.

In closing, defense counsel argued:

> The state has touted the expert opinion of Terri Stewart. I think they just, the prosecutor just said that she took all of her many years of experience, and all of the patients that she has examined, and all of the patients that her—people under her supervision have examined.
> That is not my memory of the testimony.
> She was specifically asked how many cases had she worked on as an expert and she said 10 or 11.
> Again as jurors, it is your memories that count, but she said she worked on 10, maybe 11 cases as an expert.
> And what did she said her training was? A one-day seminar, I think, from the King County Medical Examiner, and then a four-day training I think she said. That is her training.

In rebuttal the prosecutor argued, over a defense objection:

> A little bit of misinformation regarding Terri Stewart's testimony. . . .
> Well, as you clearly heard nurse Stewart, Terri Stewart testified, she has been involved in 10 criminal cases, and that is what [the defense] told you that she evaluated this case against. And that is not what she testified to, is not what I told you during closing argument.
> What she testified to was all of the reports that she has dealt with as being a nurse, that that is her breadth of experience of dealing with strangulation.
> Her expert testimony knowledge, the amount of times she has testified in court, or has been potentially involved in court cases, that is the 10 that she was referring to, that she clearly referred to.

Apodaca contends that the prosecutor impugned defense counsel by referencing the defense's closing and stating "[a] little bit of misinformation regarding Terri Stewart's testimony." Apodaca argues that misinform means "to give incorrect, untrue, or misleading information to," which implies to the jury that defense counsel lied during her closing argument.

Apodaca argues that this case is analogous to Thorgerson, where the court found that the "prosecutor went beyond the bounds of acceptable behavior [during closing] in disparaging defense counsel." 172 Wn.2d at 452. In Thorgerson, the

-11-

prosecutor's statement that defense counsel used a "sleight of hand" and called the defense's presentation of his case "bogus" were improper. Thorgerson, 172 Wn.2d at 452. No misconduct occurs, however, "[t]o the extent these comments can fairly be said to focus on the evidence before the jury." 172 Wn.2d at 451. Apodaca contends that the prosecutor's use of the word "misinformation" was similar in severity to stating the defense's case was "bogus" or the defense used a "sleight of hand." We disagree.

Both the prosecutor and defense counsel correctly characterized certain aspects of Stewart's testimony. When Stewart was asked how many sexual assault cases she reviews on a monthly or yearly basis, there was an objection by defense counsel, and after the objection was sustained, Stewart answered the question collectively for the whole program, rather than herself. The prosecutor argued that Stewart's overall breadth of experience aided in her review of this case, while the defense argued that Stewart's relevant experience was limited to her work on 10 criminal cases. In addition, Stewart's reference to working on ten cases, was specifically about strangulation cases. Both parties' characterizations of the evidence can be derived from Stewart's testimony, with each side emphasizing the favorable portions of Stewart's testimony to their argument.

Viewed in context, the prosecutor's use of the word "misinform" did not disparage defense counsel, or impugn her integrity. In Thorgerson, the prosecutor referenced the defense's presentation of the case as a whole, rather than characterizing witness testimony that could be subject to two interpretations. 172 Wn.2d at 451 ("The entire defense is a sleight of hand" and "'sleight of hand' implies trickery or wrongdoing and can be interpreted as an attack on counsel rather than on counsel's arguments."). The

court commented that, "isolated remarks calling defense arguments 'bogus' and 'desperate,' while strong and perhaps close to improper, do not directly impugn the role or integrity of counsel, and such isolated comments are unlikely to amount to prosecutorial misconduct." Thorgerson, 172 Wn.2d at 466. Here, the prosecutor was attacking defense counsel's characterization of Stewart's testimony during closing, not defense counsel's role or integrity. We conclude that the prosecutor's statement was not improper.

## C.

Next, Apodaca argues that the prosecutor improperly accused defense counsel of coaching Apodaca's testimony. Apodaca objects to the following statement by the prosecutor:

> When Mr. Apodaca testified, he did put on quite a show.
> You noticed during the direct examination part where [defense counsel] asked him some questions first, he—when it was appropriate to do so, when it fit the questions in an appropriate manner, he turned the tears on, right at that point.
> But when he spoke with me, it was a much different Alfred Apodaca before you. A more hostile man. Angrier. Quicker to snap. And that is the thing about when you come up here and you take the stand and you are looking at 12+ jurors.
> When you sit there and your lawyer is asking you questions, you have a good idea of the questions that are going to come at you. [objection by defense, sustained by the court on the grounds that it is within the jury's province to weigh the evidence, and determine what the facts are]
> But when you are on cross, you don't really know the layout of the questions, what subjects you are going to cover. Maybe they will be worded in a way that you are not thinking about, and you need to think a little bit quicker on your feet, and when Mr. Apodaca was forced to do that, you saw a much truer version of the defendant, a man that, when he is pushed, even just a little bit, was ready to lash out.

Apodaca argues that the prosecutor's comment, that Apodaca had "a good idea of the questions" defense counsel asked and Apodaca "put on quite a show," implied that defense counsel coached Apodaca's testimony and was an improper comment on Apodaca's assertion of his constitutional right. We disagree.

The State may not "unnecessarily 'chill' or penalize the assertion of a [defendant's] constitutional right and the State may not draw adverse inferences from the exercise of a constitutional right." State v. Rupe, 101 Wn.2d 664, 705, 683 P.2d 571 (1984) (citations omitted). "A prosecutor may, however, touch upon a defendant's exercise of a constitutional right, provided the prosecutor does not "'manifestly intend the remarks to be a comment on that right.'"" State v. Martin, 151 Wn. App. 98, 104, 210 P.3d 345 (2009) (citations omitted).

Apodaca argues that this case is analogous to State v. Wallin, 166 Wn. App. 364, 366, 269 P.3d 1072 (2012). In Wallin, the prosecutor asked, during cross-examination, whether Wallin had the advantage of hearing the testimony in the courtroom before taking the stand. Division Three of this court held that those questions generically suggested tailoring, and violated the defendant's right "to appear and defend in person" and "to testify in his own behalf." Wallin, 166 Wn. App. at 367, 377 (citing Wash. Const. art. I, sec. 22). Apodaca argues the prosecutor's comments during closing argument—that he knew in advance the questions he would be asked during direct-examination—suggested generic tailoring, and thus constituted prosecutorial misconduct. We disagree.

The prosecutor's statement was not improper. In Wallin, the questions were improper because they undermined the defendant's right to be in the courtroom during

his trial, by implying that he was listening to witness testimony, and conforming his own testimony accordingly. 166 Wn. App. at 376. A prosecutor may ask similar questions during cross-examination, however, without violating the defendant's constitutional rights when the question is "based upon something that the defendant voluntarily puts into evidence." Wallin, 166 Wn. App at 376 (citing Martin, 171 Wn.2d at 536 (holding the defendant opened the door on cross-examination by stating, "I'm saying this time, because of prior testimony, that I heard")).

In this case, Apodaca's credibility was at issue. The prosecutor never suggested that Apodaca tailored his testimony to match the testimony of others. During closing argument, a prosecutor may argue how the jury should interpret the evidence, including how to interpret the defendant's demeanor while testifying. Copeland, 130 Wn.2d at 291. Here, the prosecutor made the comments to draw a distinction for the jury between direct and cross-examination, and the change in Apodaca's demeanor. See Thorgerson, 172 Wn.2d at 448 ("In closing argument the prosecuting attorney has wide latitude to argue reasonable inferences from the evidence, including evidence respecting the credibility of witnesses."). The prosecutor's statements were not improper because he argued Apodaca's credibility based on observational inferences from Apodaca's demeanor while testifying.

No. 76517-I/16

Affirmed.

_____ Mann, ACJ

WE CONCUR:

_____ Andrus, J.

_____ Chun, J.