### STATE OF CONNECTICUT *v.* DAVID N.J.*
### (SC 18686)

Rogers, C. J., and Norcott, Palmer, Zarella, McLachlan, Eveleigh and Vertefeuille, Js.

---

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline

to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

Argued February 14—officially released June 7, 2011

*James B. Streeto*, assistant public defender, for the appellant (defendant).

*Melissa L. Streeto*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Edward R. Narus*, senior assistant state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. A jury found that the defendant, David N.J., sexually abused his stepgranddaughter over a two year period, and returned a verdict finding him guilty of three counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2),[1] and one

___

[1] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . ."

count of risk of injury to a child in violation of General Statutes (Rev. to 2005) § 53-21.[2] The defendant appeals[3] from the judgment of conviction, rendered in accordance with the jury's verdict, and claims that the trial court improperly: (1) restricted his cross-examination of the physician who examined the victim in this case after she reported the sexual assaults; (2) failed to disclose all relevant material following an in camera review of confidential department of children and families (department) records; (3) ordered remedies adversely affecting the defendant for an apparent violation of a sequestration order by his attorney's investigator, despite the fact that the sequestration order only applied to the state's witnesses; and (4) provided a supplemental jury instruction that expanded the crimes charged in the information by defining the term "vaginal intercourse" in accordance with our interpretation of General Statutes § 53a-65 (2)[4] in *State* v. *Albert*, 252

[2] General Statutes (Rev. to 2005) § 53-21 provides in relevant part: "(a) Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child, or (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of a class C felony for a violation of subdivision (1) . . . of this subsection and a class B felony for a violation of subdivision (2) of this subsection. . . ."

All references in this opinion to § 53-21 are to the 2005 revision, unless otherwise indicated.

[3] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[4] General Statutes § 53a-65 (2) provides: " 'Sexual intercourse' means vaginal intercourse, anal intercourse, fellatio or cunnilingus between persons regardless of sex. Its meaning is limited to persons not married to each other. Penetration, however slight, is sufficient to complete vaginal intercourse, anal intercourse or fellatio and does not require emission of semen. Penetration may be committed by an object manipulated by the actor into the genital or anal opening of the victim's body."

Conn. 795, 750 A.2d 1037 (2000). We disagree and, accordingly, affirm the judgment of the trial court.

The record reveals the following relevant background facts, which the jury reasonably could have found, and procedural history. The victim, who is the stepgranddaughter of the defendant, was born in August, 1997. From August, 2003, through December, 2005, the victim resided in an apartment in Hartford with her father V,[5] her older brother VJ, and three younger siblings. During that time period, the defendant was a frequent visitor to the victim's home, and he moved into the apartment during the middle of 2005 after his wife entered a nursing home.

Thereafter, the defendant had frequent opportunities to be alone with the victim because V often asked the defendant, who temporarily had been out of work due to a fractured arm, to watch the children while V was at work or school. If V was away from home or was at home sleeping, the defendant would often take the victim into his bedroom and engage her in acts of vaginal intercourse, both penile and digital, and fellatio; he gave the victim money after she engaged in these acts.[6] At some point during that two year period, the victim confided in VJ, who was also her best friend, that the defendant had been touching her inappropriately. Thereafter, whenever the defendant took the victim into the bedroom, if VJ was around, he would go to the door

[5] The victim's family moved to Hartford shortly after the victim's mother died in 2002 while they were living in South Carolina.

[6] The victim testified that the defendant gave her large sums of money, up to hundreds of dollars, after engaging in sexual acts with her. Both VJ and an older cousin, R, testified that they had seen the victim with large sums of money. At one point, R saw the then eight year old victim in possession of more than $100. On this point, V testified that the most money he had ever given VJ or the victim was approximately $5 as allowance for doing household chores; V knew that the defendant had also given VJ and the victim some money for doing chores, but thought that it would be no more than $5.

and either listen briefly or attempt to peek at what was happening through a small gap at the bottom of the door to the hallway. At one point, VJ was able to see the victim lying naked atop a set of pillows on the floor in the bedroom; the victim subsequently caught VJ at the door when she saw his socks outside the room through the gap and asked him to stop eavesdropping.[7] Neither the victim nor VJ told V of the ongoing abuse because they were afraid that no one would believe them. The victim also feared that V would injure the defendant and then ultimately be sent to prison.

On Christmas Eve in 2005, the defendant made the victim perform fellatio on him before she and her family left to visit her aunt's house. At that time, the family was preparing to move because their apartment was not in good condition, and the defendant was also about to find his own place to live. When they returned home that night, the defendant was not present, and VJ convinced the victim to tell an adult about the abuse. The victim first told R, an older cousin, who instructed her to tell V of the abuse.

The victim told V about the abuse later that day, and V brought the victim to the Connecticut Children's Medical Center. After medical personnel there alerted the department and the Hartford police about the victim's allegations, the victim was referred to the Aetna Foundation Children's Center at Saint Francis Hospital and Medical Center, where she underwent a diagnostic interview by Lisa Murphy-Cipolla, a clinical social

---

[7] Subsequently, Phillip J. Clark, a Hartford police detective, after interviewing VJ, went to the apartment and determined that there was a gap of approximately one and one-quarter inches between the bedroom door and the hallway floorboards, through which he could see approximately three feet into the bedroom. Wendy Clapp and Guillermo Acaron, investigators with the office of the defendant's attorney, testified similarly, noting that the farthest they could see into the defendant's bedroom through the gap was twenty-seven inches.

worker, and an examination by Frederick Berrien, a physician.[8] The investigation continued when Phillip J. Clark, a Hartford police detective, subsequently reviewed a video recording of Murphy-Cipolla's interview of the victim, and then conducted an interview of the defendant.[9]

Subsequently, the state charged the defendant with five counts of sexual assault in the first degree in violation of § 53a-70 (a) (2), and one count of risk of injury to a child in violation of § 53-21. The defendant's theory of the case during the subsequent jury trial was that the victim was a habitual liar who, acting in concert with VJ, had fabricated the charges against the defendant to force him to move out because she: (1) was angry that he had taken her bedroom after he moved in; and (2) resented his attempts to discipline her. The jury, however, returned a verdict finding the defendant guilty on counts one, two and five of the information alleging, respectively, sexual assault in the first degree by digital-vaginal penetration, penile-vaginal penetration, and fellatio, and count six alleging risk of injury to a child; the jury found him not guilty on counts three and four of the information alleging sexual assault in the first degree by penile-anal penetration and cunnilingus. After denying the defendant's motions for a new trial and

[8] A physical examination did not reveal any physical injuries to or abnormalities of the victim's genital and anal areas. Berrien testified that this did not, however, rule out the occurrence of sexual assault because that area of the body heals quickly from injury, particularly in children, and a long time had passed between the last instance of vaginal penetration and the time of examination; indeed, it had been six days since the last sexual contact at all, which was fellatio.

[9] During the interview with Clark, the defendant denied the victim's allegations and stated that he did not need a "little girl 'to get off' " because he had an arrangement with his brother's wife to engage in sexual activity every Wednesday. After giving inconsistent answers to Clark about whether he had been alone with the victim and VJ, the defendant also stated that he could not have had oral sex with the victim because he "would end up choking her."

for a postverdict judgment of acquittal, the trial court rendered a judgment of conviction in accordance with the jury's verdict and sentenced the defendant to a total effective sentence of twenty-nine years imprisonment with ten years of special parole. This appeal followed.

On appeal, the defendant claims that the trial court improperly: (1) restricted his cross-examination of the physician who had examined the victim; (2) failed to disclose all relevant material from the victim's confidential department records following an in camera review; (3) imposed remedies for an apparent violation of the sequestration order by his attorney's investigator, despite the fact that the sequestration order in effect did not apply to defense witnesses; and (4) enlarged the offenses charged in the information while responding to a jury request for a supplemental instruction about the definition of "penetration." Additional relevant facts and procedural history will be set forth as necessary in the context of each claim.

I

We begin with the defendant's claim that the trial court improperly restricted his cross-examination of Berrien, the physician who had examined the victim after she reported the assaults, on the ground that the victim's testimony did not provide a sufficient foundation for his questions regarding whether injury would be more likely to result from the repeated insertions and extractions of an adult male penis into the vagina of a prepubescent child. The defendant also cites *Livingstone* v. *New Haven*, 125 Conn. 123, 3 A.2d 836 (1939), and notes that the commentary to § 7-4 (c) of the Connecticut Code of Evidence[10] supports his argument

[10] Section 7-4 (c) of the Connecticut Code of Evidence provides: "Hypothetical questions. An expert may give an opinion in response to a hypothetical question provided that the hypothetical question (1) presents the facts in such a manner that they bear a true and fair relationship to each other and to the evidence in the case, (2) is not worded so as to mislead or confuse the jury, and (3) is not so lacking in the essential facts as to be without

that, as a hypothetical question to an expert witness, § 7-4 (c) should have been applied with increased liberality because the question was intended to impeach the accuracy of Berrien's direct examination testimony. Finally, the defendant argues that the trial court's evidentiary ruling violated his right to confrontation under the sixth amendment to the United States constitution because it would have yielded evidence relevant to the central issue in the case, namely, whether the victim's allegations were fabricated, given that her lack of injury was inconsistent with her allegations of repeated and painful sexual assaults.

In response, the state, relying on *Floyd* v. *Fruit Industries, Inc.*, 144 Conn. 659, 136 A.2d 918 (1957), contends that the trial court did not abuse its discretion in precluding the defendant from asking this hypothetical question because it was not supported by the evidence. The state posits that there was no evidence of acts of repeated vaginal penetration during any one single instance of abuse, either through the victim's testimony or Murphy-Cipolla's testimony concerning the victim's interview, and that the defendant did not avail himself of the opportunity to cross-examine the victim further

value in the decision of the case. A hypothetical question need not contain all of the facts in evidence."

The commentary to § 7-4 (c) of the Connecticut Code of Evidence provides: "Subsection (c) embraces the common-law rule concerning the admissibility of a hypothetical question and, necessarily, the admissibility of the ensuing expert's opinion in response to the hypothetical question. . . . In accordance with case law, subsection (c) recognizes that the hypothetical question must contain the essential facts of the case . . . but need not contain all the facts in evidence. . . .

"Subsection (c) states the rule concerning the framing of hypothetical questions on direct examination. . . . The rules governing the framing of hypothetical questions on direct examination and for the purpose of introducing substantive evidence are applied with increased liberality when the hypothetical question is framed on cross-examination and for the purpose of impeaching and testing the accuracy of the expert's opinion testimony given on direct examination. . . . Common law shall continue to govern the use of hypothetical questions on cross-examination." (Citations omitted.)

on that point. Noting that the defendant essentially concedes that he had the opportunity to conduct a comprehensive cross-examination of Berrien, the state emphasizes that the trial court did not abridge the defendant's confrontation rights because he had ample opportunity to elicit from Berrien testimony that repeated and deeper sexual penetration by an adult male would increase the odds of injury to a young girl. We agree with the state and conclude that the trial court's evidentiary ruling was neither an abuse of discretion nor a violation of the defendant's confrontation rights.

The record reveals the following additional relevant facts and procedural history. During cross-examination, Berrien testified that, when he took the victim's medical history, she did not report experiencing symptoms that would be suggestive of sexual abuse, including changes in sleep, eating, bowel or bladder habits, or complaints of headaches or abdominal pain. Berrien then testified that, in sexual assault cases, certain factors are more likely to cause physical injury to a child victim, including deeper penetration of a prepubescent child, repetition and multiple acts of abuse, the absence of any artificial lubrication, the application of greater amounts of force and the relative size disparity between a grown adult and a child. The defendant's counsel then asked Berrien: "So where an adult male penis was inserted forcibly against that person's will; it was forced *in and out, in and out, and in and out.* Is that the kind of force that would display injuries?" (Emphasis added.) The state objected to this question for lack of evidentiary foundation.

The trial court sustained the state's objection and disagreed with the defendant's claim that the inference to be drawn from the question was fair given the victim's testimony about repeated instances of penile penetration of her vagina and anus over the two year period.

The court stated that it did not "recall any testimony as to a given incident that it was in and out, in and out." The trial court then rejected the defendant's offer to pose the question as a hypothetical instead, concluding that the victim "was here, [and] could have been asked if, with respect to these incidents, there was repeated insertion and extraction, insertion and extraction, on a given incident." The trial court further noted that, given the victim's age, it was not "even sure that it was possible to insert and extract," and concluded that the defendant's question of Berrien required him first to have asked the victim to testify "to her observation or her sensation" during the assaults.

Thereafter, the defendant continued his cross-examination, and Berrien testified that: (1) there would be a "possibility" of scarring if abuse had occurred multiple times over a two year period; (2) some abuse can cause permanent genital injuries, particularly defects of the hymen; and (3) he could not say on the basis of the physical examination whether penile or digital penetration of the vagina or anus had occurred in this case because there were no visible abrasions, bumps or bruising of the victim's inner thighs or genitalia, no injury or tearing of the hymen, labia minora or labia majora, and no anal lacerations. Berrien further testified that there are other causes for childhood vaginal bleeding besides sexual assault, such as infection.

The sixth amendment to the United States constitution "guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . ." (Internal quotation marks omitted.) *State* v. *Davis*, 298 Conn. 1, 8, 1 A.3d 76 (2010). "[T]he confrontation clause does not [however] suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination . . . [or] to present every piece of evidence he wishes."

(Citation omitted; internal quotation marks omitted.) Id., 9–10. These principles extend similarly to the cross-examination of the state's expert witnesses in order to determine the reliability of their testimony. See, e.g., *State* v. *Gaynor*, 182 Conn. 501, 509, 438 A.2d 749 (1980). We first review the trial court's evidentiary rulings, "if premised on a correct view of the law . . . for an abuse of discretion. . . . If, after reviewing the trial court's evidentiary rulings, we conclude that the trial court properly excluded the proffered evidence, then the defendant's constitutional claims necessarily fail. . . . If, however, we conclude that the trial court improperly excluded certain evidence, we will proceed to analyze [w]hether [the] limitations on impeachment, including cross-examination, [were] so severe as to violate [the defendant's rights under] the confrontation clause of the sixth amendment . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Davis*, supra, 10–11.

"An expert may give an opinion in response to a hypothetical question provided that the hypothetical question (1) presents the facts in such a manner that they bear a true and fair relationship to each other and to the evidence in the case, (2) is not worded so as to mislead or confuse the jury, and (3) is not so lacking in the essential facts as to be without value in the decision of the case. A hypothetical question need not contain all of the facts in evidence." Conn. Code Evid. § 7-4 (c). The rule as stated in § 7-4 (c) is applicable to direct examination; it is "applied with increased liberality when the hypothetical question is framed on cross-examination and for the purpose of impeaching and testing the accuracy of the expert's opinion testimony given on direct examination. . . . Common law shall continue to govern the use of hypothetical questions on cross-examination." (Citations omitted.) Conn. Code Evid. § 7-4 (c), commentary.

Thus, the determination of whether a hypothetical question to an expert witness is admissible "calls for the exercise of a sound discretion as to whether the question, even though it does not contain all of the facts in evidence, presents the facts in such a manner that they bear a true and fair relationship to each other and to the whole evidence in the case . . . is not so worded as to be likely to mislead or confuse the jury; and is not so lacking in the essential facts as to be without value in the decision of the case." (Citations omitted.) *Floyd* v. *Fruit Industries, Inc.*, supra, 144 Conn. 666. "The purpose of such cross-examination is to test the credibility of the witness and the accuracy and reasonableness of his direct testimony." Id., 667, citing *Livingstone* v. *New Haven*, supra, 125 Conn. 127–28. Although during "the cross-examination of an expert witness a greater latitude may be permitted"; *Livingstone* v. *New Haven*, supra, 127; the trial court has the discretion to preclude hypothetical questions that are likely to mislead or confuse the jury. See *State* v. *Gaynor*, supra, 182 Conn. 510–11.

We conclude that the trial court did not abuse its discretion in sustaining the state's objection to the defendant's hypothetical question. On the basis of the testimony already adduced from both the victim and Berrien, the trial court reasonably could have determined that this question was likely to confuse the jury. Specifically, the victim had testified only as to slight penetration of her vaginal area at any given time[11] and, as the state notes, was never questioned on direct or

---

[11] With respect to penile-vaginal penetration, the following exchange occurred between the state's attorney and the victim:

"Q. Okay. And when he put his private part there, did he put it on the outside or on the inside?

"A. Like kind of on the outside.

"Q. Okay. Did he ever put it towards the inside or—

"A. A little bit, once.

"Q. One time, he put a little on the inside? How far did he put it in?

"A. Not really—not really far.

cross-examination regarding whether the particular encounters involved repeated insertions and extractions of either the defendant's finger or his penis. See *Kirchner* v. *Yale University*, 150 Conn. 623, 629–30, 192 A.2d 641 (1963) (trial court did not abuse its discretion in determining that hypothetical question about whether it would have been negligent for injured plaintiff not to use push block in operating jointer tool was confusing to jury in absence of evidence that push block was available at time of injury). Moreover, the trial court's ruling is supported by its conclusion, based on Berrien's testimony, that such repeated insertions and extractions might not have even been possible given the anatomy of a prepubescent child.[12] Indeed, this testimony undermines the defendant's appeal to common sense in support of his contention that the very act of sexual intercourse necessarily requires repeated insertion and extraction, even in cases involving prepubescent child victims.[13] Accordingly, the trial court neither

---

"Q. Okay. And how did that feel when he did that?

"A. That hurted, too."

With respect to digital-vaginal penetration, the victim testified that the defendant had touched her "[i]n the inside," and "[l]ike halfway, not the whole thing." She responded in the affirmative in response to the question from the state's attorney that the defendant "put it in a little bit?"

[12] Specifically, Berrien had testified on direct examination that an adult male penis "has more difficulty in penetrating on a prepubescent child. It's because it just can't penetrate that far in. In large part, in these cases, it appears that the penis goes between the labia, between the legs, and does not penetrate far into the vagina of a child. The vestibule still is considered part of the vagina, and certainly that can be entered partially with an erect penis." Indeed, on cross-examination, Berrien stated that penetration would not be eased by any natural lubrication of the vagina of a prepubescent child.

[13] We also disagree with the defendant's argument that the trial court had improperly determined that the victim's testimony that the defendant had gone " 'up and down' " did not provide an adequate evidentiary foundation for the hypothetical question. As the state notes, this testimony did not provide an adequate foundation because the hypothetical question was asked in the context of vaginal penetration, while the victim's testimony that the defendant had gone " 'up and down' " pertained only to the victim's allegations that the defendant occasionally stimulated himself by putting his penis between her buttocks and moving about. Indeed, the jury's verdict indicates

abused its discretion nor violated the defendant's confrontation rights by precluding him from questioning Berrien hypothetically about the likelihood of injury arising from repeated insertions and extractions.

## II

We next turn to the defendant's claim that the trial court improperly failed to disclose, for purposes of cross-examination, certain of the department's records pertaining to the victim after the court had conducted an in camera review of those records. Citing *State* v. *King*, 216 Conn. 585, 583 A.2d 896 (1990), on appeal after remand, 218 Conn. 747, 591 A.2d 813 (1991), the defendant asks us to conduct an in camera review of these department records to determine whether the trial court should have released additional records to the defendant. In response, the state relies on *State* v. *George J.*, 280 Conn. 551, 910 A.2d 931 (2006), cert. denied, 549 U.S. 1326, 127 S. Ct. 1919, 167 L. Ed. 2d 573 (2007), and *State* v. *Esposito*, 192 Conn. 166, 471 A.2d 949 (1984), and contends that the trial court properly disclosed only those department records that were exculpatory or relevant for confrontation purposes. We agree with the state and conclude that the trial court

that it found that these acts did not occur in a manner sufficiently penetrative to constitute actual anal intercourse.

We similarly disagree with the defendant's reliance on *State* v. *Rinaldi*, 220 Conn. 345, 599 A.2d 1 (1991), for the proposition that evidence that repeated penetration in any given encounter would be likely to cause injury was relevant to show that the lack of injury makes it more likely that the victim's allegations were fabricated. In *Rinaldi*, we concluded that evidence pertaining to the victim's sexual conduct on the night of the alleged sexual assault was relevant under the source of semen exception to the rape shield statute, General Statutes § 54-86f, in a case wherein the defendant had claimed that he gave the victim therein a ride home, but did not have sexual relations with her. Id., 354–57. This case is distinguishable from *Rinaldi* because *Rinaldi* did not involve a hypothetical question, and in the present case, the trial court reasonably could have determined that the factual predicate for the otherwise relevant point that the defendant sought to advance was not supported by the record.

did not abuse its discretion in disclosing only certain department records.

The record reveals the following additional relevant facts and procedural history. Prior to trial, the defendant subpoenaed and moved for in camera review of the victim's records from her primary care pediatric practice, elementary school and the department. The trial court held a pretrial hearing on the defendant's various motions, noted that the victim's guardian had consented to an in camera review, and denied the defendant's motions for disclosure of the name of the victim's sexual assault counselor and for an in camera review of the victim's school and pediatric records. On the basis of the department's involvement in the investigation of this case, the trial court did, however, agree to conduct an in camera review of its records;[14] that review would, however, be limited only to the present case exclusive of an unsubstantiated matter also involving the victim's family from several years before.[15] Thereafter, the court finished its in camera review and provided the defendant with portions culled from the department's records that it marked as court exhibits 7 and 8, which it found might affect his defense.

"In *State* v. *Esposito*, supra, 192 Conn. 179–80, we set forth the following procedure for the disclosure of confidential records. If . . . the claimed impeaching information is privileged there must be a showing that there is reasonable ground to believe that the failure to produce the information is likely to impair the defendant's right of confrontation such that the witness'

---

[14] With respect to the department's file pertaining to the victim, the defendant had claimed that the records of the department's investigation would contain relevant or exculpatory information, in particular, witness interviews and information about the victim's veracity that would yield relevant impeachment evidence.

[15] The trial court stated that it would advise the defendant to subpoena any additional records that the in camera review might reveal to be relevant.

direct testimony should be stricken. Upon such a showing the court may then afford the state an opportunity to secure the consent of the witness for the court to conduct an in camera inspection of the claimed information and, if necessary, to turn over to the defendant any relevant material for the purposes of cross-examination. If the defendant does make such showing and such consent is not forthcoming then the court may be obliged to strike the testimony of the witness. If the consent is limited to an in camera inspection and such inspection, in the opinion of the trial judge, does not disclose relevant material then the resealed record is to be made available for inspection on appellate review. If the in camera inspection does reveal relevant material then the witness should be given an opportunity to decide whether to consent to release of such material to the defendant or to face having her testimony stricken in the event of refusal." (Internal quotation marks omitted.) *State* v. *Kemah*, 289 Conn. 411, 425–26, 957 A.2d 852 (2008).

We review under the deferential abuse of discretion standard a trial court's conclusions with respect to whether a defendant has failed to make a threshold showing of entitlement to an in camera review of statutorily protected records, or whether confidential records that the court has reviewed in camera "sufficiently disclose material especially probative of the [witness'] ability to comprehend, know, and correctly relate the truth." (Internal quotation marks omitted.) *State* v. *Cecil J.*, 291 Conn. 813, 828–29 n.12, 970 A.2d 710 (2009); see also, e.g., *State* v. *George J.*, supra, 280 Conn. 599–600.

We note that the defendant does not contend on appeal that the trial court abused its discretion in declining to conduct an in camera review of the victim's pediatric, school and counseling records. Rather, the defendant's claims are limited only to seeking appellate

review of the material that the trial court reviewed in camera, namely, the department's records, which are confidential under General Statutes § 17a-28. See, e.g., *State* v. *George J.*, supra, 280 Conn. 599. Having reviewed the sealed department records contained in the court file, we conclude that the trial court did not abuse its discretion in finding the undisclosed portion of the department's file either irrelevant or cumulative of the disclosed portions, and declining to provide it to the defendant.

## III

We now turn to the defendant's claim that, after the trial court determined that the sequestration order in effect only applied to the state's witnesses, it, as a remedial measure, improperly: (1) instructed the jury about the existence of the sequestration order; and (2) permitted the prosecutor to cross-examine Wendy Clapp, the investigator of the defendant's attorney, about her presence in the courtroom during the trial, and then comment on that topic during summations. Specifically, the defendant contends that the trial court abused its discretion in imposing these remedies, which were in effect sanctions, because the terms of the sequestration order that was in effect applied only to the state's witnesses. The defendant also contends that these sanctions were particularly prejudicial because the prosecutor's comments during summation cast doubt over the entire defense case by appealing to urban myths about unscrupulous criminal defense attorneys.[16]

[16] Relying on this court's recent waiver jurisprudence; see, e.g., *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011); the defendant also contends that the state is precluded from attacking the unilateral sequestration order because it initially failed to object to the defendant's motion seeking that exact order. Although we find somewhat ironic the state's argument that principles of waiver and induced error do not apply in this case because the prosecutor did not object since he was under the impression that he was assenting to a legally correct sequestration order, we nevertheless conclude that these principles are inapplicable and do not mandate reversal of the trial court's judgment in this case. First, these principles pertain to

In response, the state contends that the trial court did not abuse its discretion in crafting a solution to problems created by its original sequestration order, which, because of an inadvertent oversight by the trial court and the prosecutor, applied only to the state's witnesses. The state further contends that the remedy imposed by the trial court was, in any event, harmless error because it did not affect the victim's credibility with respect to the defendant's theory of fabrication by the victim, and Clapp's testimony was corroborated by the testimony of Guillermo Acaron, the defendant's other investigator, and Clark, the Hartford police detective. We agree with the state and conclude that the jury instruction, as well as the prosecutor's cross-examination and summation, did not constitute an abuse of discretion and did not deprive the defendant of a fair trial.

The record reveals the following additional relevant facts and procedural history. The defendant filed numerous "standard" pretrial motions, including one seeking the sequestration of the state's witnesses[17] pursuant to, inter alia, Practice Book § 42-36.[18] After the prosecutor declined to oppose the defendant's motion,

requests for appellate review, under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), of claims not raised before the trial court, while the issues presented in this appeal with respect to the sequestration order were extensively litigated before the trial court. Second, we note that the sequestration issues did not arise from the state's objections but, rather, from the trial court's sua sponte actions.

[17] The defendant's written motion asked the trial court to order: (1) "[t]hat all witnesses expected to be called to testify for the prosecution during the course of pretrial hearings and/or trial be sequestered for the duration of such proceedings"; and (2) "[t]hat the prosecuting authority inform its witnesses of the order hereon and caution such witnesses not to discuss their testimony or the testimony of other possible witnesses with other witnesses during the pendency of such proceedings."

[18] Practice Book § 42-36 provides: "The judicial authority upon motion of the prosecuting authority or of the defendant shall cause any witness to be sequestered during the hearing on any issue or motion or during any part of the trial in which such witness is not testifying."

the trial court granted it and instructed the prosecutor to "advise all of your witnesses of their obligations under that order."

The following day, at the start of evidence, while discussing the procedure by which the victim would be questioned, the trial court stated that it could "order that persons be prohibited from entering and leaving the courtroom during the testimony." The defendant then stated that he had no objection to that order, except he noted that Clapp might need to come into the courtroom late because she was attending to arraignments in a different courtroom. The trial court then asked the defendant to advise Clapp to come in through the side hallway door; the prosecutor assented, despite his preference for not "having people walking in and out . . . ." After discussion of other matters, the defendant then referred back to the sequestration motion, clarified his understanding that it precluded witnesses from discussing their testimony or the trial with others, and requested that the court instruct the witnesses to that effect. The prosecutor did not oppose the trial court's decision to instruct the witnesses accordingly, observing that "[w]e tell the witnesses that ourselves."

Several trial days later, the defendant called Clapp as a witness. The trial court sua sponte called for a sidebar conference. The trial court noted that it had granted the defendant's "request . . . for sequestration of witnesses," that the "state didn't object," and that the court had just realized that Clapp "had been in here during the testimony of other witnesses." The court stated its "understanding of a sequestration order is [that] it applies to everybody, and not just the state's witnesses, the defense, having made the motion." The trial court then reviewed the discussion of the order

and a proffer of Clapp's testimony,[19] and noted that the written motion was limited to the prosecution's witnesses. The prosecutor argued, however, that when the parties had conferred with the court about the pretrial motions, the defendant had represented that all, including the sequestration motion, were "boilerplate motions," and the prosecutor, based on his eighteen years of trial experience, had assumed that the sequestration motion applied bilaterally to both sides' witnesses. Describing the defendant's unilateral motion as "patently unfair," the prosecutor noted that he would have objected had he realized that the defendant's motion was limited to the state's witnesses.[20] In response, the defendant agreed that he had described the sequestration motion as routine, but emphasized that his practice was to make a unilateral motion to sequester the state's witnesses, and the court would then grant the motion in accordance with the state's subsequent request that the order be applied bilaterally. The defendant further contended that he "can't be responsible" for the prosecutor's failure to read the two page, double-spaced motion or make an oral motion to have it apply bilaterally.

---

[19] The defendant proffered that Clapp would testify that she and Acaron went to the family's home to measure how far they could see into the room through the crack in the door from the hallway outside, and from VJ's room across the hall, as well as what they could see from those vantage points; nothing could be seen into that room through its door from the kitchen. The defendant stated that Clapp's testimony would not be affected by her presence for any portion of the state's case.

[20] The prosecutor argued further that "to suggest somehow that we're going to have to abide by the sanctity of the process and the defense side doesn't, basically obviates the reason for having the [sequestration] rule and it basically undermines this process that we have." The prosecutor further emphasized that the defense was aware that what VJ could see under the door would be an issue, making it more prejudicial that Clapp had the opportunity to be present during the testimony after having performed the experiment at the apartment. The prosecutor also argued that the trial court's oral ruling on the motion itself extended to all witnesses, rather than just the prosecution's witnesses, indicating that the court had made the same presumption as the prosecutor.

After a brief recess, the trial court noted that the first issue to resolve was the extent of the sequestration order in effect, in order to determine whether it had been violated by Clapp's presence in the courtroom. The trial court then stated that it viewed a "standard" sequestration motion as bilateral in nature,[21] and agreed with the state that the motion it had granted, as requested by the defendant, was "fundamentally unfair." Nevertheless, the trial court concluded that the written sequestration order in effect "is what it is," namely, limited to the state's witnesses, and stated that it would therefore not impose the sanction of precluding Clapp from testifying. After further discussion, the trial court then concluded, however, that, due to the circumstances of the case, it would permit the prosecutor to question Clapp about the fact that she "was present during testimony," but that once the prosecutor had "established that she was present and heard the testimony of other witnesses, that she may have spoken with people, even as to witnesses she wasn't present for, and learned what they said, after you've done that," it would "then give the jury an instruction that, pursuant

[21] The trial court further advised defense counsel to inform his colleagues in the public defender's office of its expectation that sequestration motions be bilateral in nature. The trial court emphasized, however, that it did not view defense counsel's practice of filing a unilateral sequestration motion as "intentionally . . . mislead[ing]" or "funny business," and noted that defense counsel could well have asked for a carve-out to a bilateral sequestration order to permit Clapp to be present during trial.

We note, however, that defense counsel's practice of initially requesting a unilateral sequestration order does not appear to be unique. See *State* v. *Ceballos*, 266 Conn. 364, 406, 832 A.2d 14 (2003) ("The defendant had filed a pretrial motion requesting the trial court . . . to direct the state's attorney to: [1] sequester each of its witnesses during the evidentiary portion of the jury trial; and [2] warn each of his witnesses not to discuss the contents of his or her testimony with any other witness. The trial court granted this motion applicable to the witnesses for both parties."); *State* v. *Cavell*, 235 Conn. 711, 717, 670 A.2d 261 (1996) ("[T]he defendant moved . . . that the detective be sequestered. Subsequently, the state moved for a mutual sequestration order, which the court issued." [Citation omitted.]).

to a previous order of this court, the witnesses who testified for the prosecution were not permitted to be present during the course of the trial, or to discuss their testimony with anybody." The trial court further advised the prosecutor that he "need not go into the issues of the orders. I will just tell them that was my order."[22]

Thereafter, Clapp testified on direct examination that she had investigated the crime scene at the victim's apartment and took measurements in the defendant's bedroom. She testified that the bedroom was eleven feet, six inches wide and had two doors—one from the kitchen, and one from the hallway; a wall was located twenty and one-half inches from the edge of the hallway doorway, perpendicular to the door. Clapp testified that the kitchen door was tightly sealed to the floor, but the hallway door had a gap of approximately one inch between the door and the floor. Acaron assisted Clapp with this assessment; he remained in the hallway, put his face near to the floor, peeked under the door and gave a verbal signal when he could see Clapp's feet through the gap. Clapp then determined that Acaron could see twenty-one inches into the room after he had backed up to a vantage point three feet, three inches from the door. A second measurement, taken with Acaron situated in another bedroom ten feet away from the defendant's bedroom door, revealed that Acaron could see twenty-seven inches into the defendant's bedroom.

---

[22] In arriving at this order, the trial court further observed that the prosecutor might also wish to cross-examine Clapp "regarding the similarity of conditions, including the vantage point, the ability of the child versus the ability of the adult to get their eye closer to the ground . . . ." After noting that it would permit the prosecutor to question Clapp about her presence during trial and any discussions that she might have had with other witnesses, despite the sequestration order, the court emphasized, however, that it did not "think it would behoove either side to go into the question of whether that was proper or improper, so much as to indicate that that is a fact, and the jury can take whatever they wish to from that."

On cross-examination by the prosecutor, Clapp testified that she knew that she had been sent to take the measurements because of VJ's statement to Clark; see footnote 7 of this opinion; and that she was present for the victim's testimony, but not for VJ's testimony. She also testified that she had discussed the trial testimony of VJ and the victim with defense counsel. The prosecutor did not, however, ask Clapp whether she had been aware of any sequestration order.

The trial court then instructed the jury that, "pursuant to an earlier order of this court, the witnesses presented by the state were not allowed to be present when other witnesses testified, nor were they permitted to discuss their testimony with other witnesses, or discuss with anybody any testimony which was given by any other witnesses."

Acaron subsequently testified similarly to Clapp and noted that he could not see anything until he had backed away from the door. Acaron also testified that, with both the first and second measurements, he could only see, through the gap, the front of Clapp's shoes; he could not see her legs, body or even the tops of her shoes. The prosecutor did not cross-examine Acaron.

After the close of evidence, the defendant argued extensively in his summation concerning inconsistencies in the various witnesses' trial testimony, including that of VJ, as it varied from his pretrial statements to investigators. Indeed, the defendant noted that, in VJ's statement to Clark, he averred that he had seen the defendant digitally penetrating the victim's anus through the gap in the door, while at trial he testified only that he had seen the victim lying naked atop the pillows.[23] The defendant then turned to the implausibil-

---

[23] The defendant also suggested that the jury request a playback of VJ's testimony and "listen to his story before lunch, versus his story after lunch.

"This is a similar dynamic to [VJ] giving one version of events in the statement to . . . Clark, and then giving a different version after he meets with the prosecutor."

ity of VJ's observations of the naked victim lying atop pillows through the gap at the bottom of the door, given Clapp and Acaron's testimony about the limited visibility and, particularly, Acaron's testimony that he could not see anything other than the tips of Clapp's shoes. The defendant noted further that Acaron and Clapp had taken extensive measurements documenting their findings, while the state did not present or even obtain any such precise measurements.

In the state's rebuttal summation, the prosecutor argued that much of the defendant's argument was based on "conjecture and surmise . . . ." The prosecutor then argued: "And similarly, as the defense even says, well, you know, I supposedly talked to some of these witnesses, and then when they come back and testify again, their answers change.

"Well, you heard the judge say to every witness, as they got on the stand, much in the same way that he's talked to you, don't talk about the case. You can't talk about your testimony. You can't talk with other witnesses. We need to preserve the sanctity of the testimony.

"You've heard that with each and every other witness, except that rule didn't seem to apply on the defense side with [Clapp] and [Acaron]. Because you heard that [Clapp] was the investigator on that case. She participated in this case, in preparing it.

"She was present during testimony. She consulted with the attorneys, and the client and she went out to do the work she did. She wasn't subject to the same prohibition that others are. And you consider that as well, in judging her credibility."[24] The defendant did not object to this argument.

---

[24] After additional argument on other points supporting the victim's allegations, including Berrien's testimony explaining the lack of injury, as well as other testimony disproving the defendant's statement to the police that he did not know how to operate the videocassette recorder on which he showed

In reviewing the defendant's claims with respect to the propriety of the trial court's actions, we must consider those actions in view of the purpose of sequestration, which "is an important right that facilitates the truth-seeking and fact-finding functions of a trial. . . . Sequestration serves a broad purpose. It is a procedural device that serves to prevent witnesses from tailoring their testimony to that of earlier witnesses; it aids in detecting testimony that is less than candid and assures that witnesses testify on the basis of their own knowledge. . . . In essence, [sequestration] helps to ensure that the trial is fair. . . . A trial court must take full account of the significant objectives advanced by sequestration in discerning the proper scope of a sequestration order." (Citations omitted; internal quotation marks omitted.) *State* v. *Outing*, 298 Conn. 34, 73, 3 A.3d 1 (2010), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011).

Under Connecticut's controlling statute; see General Statutes § 54-85a;[25] and a rule of practice; see Practice Book § 42-36; see footnote 18 of this opinion; "the granting of a sequestration order in criminal cases is not discretionary and can be invoked by either party." *State* v. *Robinson*, 230 Conn. 591, 598, 646 A.2d 118 (1994). To the extent a sequestration order is violated, however, the remedy lies within the trial court's discretion. See, e.g., *State* v. *Nguyen*, 253 Conn. 639, 650, 756 A.2d 833

the victim pornographic movies, the prosecutor discussed VJ specifically, noting that he is much smaller in size than the adults who peeked through the gap in their investigations of the case. The prosecutor also appealed to the jurors' common sense, stating that one would get closer to a small aperture like a keyhole in order to look through it, rather than further away like Acaron, and asked rhetorically how someone could *not* see through a one and one-quarter inch gap.

[25] General Statutes § 54-85a provides: "In any criminal prosecution, the court, upon motion of the state or the defendant, shall cause any witness to be sequestered during the hearing on any issue or motion or any part of the trial of such prosecution in which he is not testifying."

(2000). The United States Supreme Court "has recognized three sanctions for the violation of a sequestration order: (1) holding the offending witness in contempt; (2) permitting cross-examination concerning the violation; and (3) precluding the witness from testifying." *United States* v. *Hobbs*, 31 F.3d 918, 921 (9th Cir. 1994), citing *Holder* v. *United States*, 150 U.S. 91, 92, 14 S. Ct. 10, 37 L. Ed. 1010 (1893); see also *State* v. *McCown*, 68 Conn. App. 815, 821–22, 793 A.2d 281 (noting that in absence of misconduct by defendant or his attorney, exclusion of defense witness testimony is not "preferred remedy" for sequestration violations), cert. denied, 260 Conn. 927, 798 A.2d 972 (2002).

In the present case, the trial court expressly found that the terms of the sequestration order were *not* violated because, as ordered by the court, it extended only to the state's witnesses. The trial court also acknowledged, however, that this unilateral sequestration order was, in its view, a mistake that impacted the fairness of the trial and the court, therefore, sought to rectify that mistake by permitting the prosecutor to question Clapp about her exposure to the other witnesses' testimony, as well as apprising the jury about the existence of the unilateral sequestration order. We first conclude that the jury instruction was not an abuse of discretion because it was neutrally phrased and did nothing other than explain the purpose of the admonition that the trial court had given to every departing witness in the presence of the jury.

We further conclude that it was not an abuse of discretion for the trial court to permit the prosecutor to cross-examine Clapp regarding her opportunity to tailor her testimony because of her presence at trial and discussions of the testimony with counsel, and to allow commentary on that subject generally during summations. Although the parties' briefs do not cite any case law directly on point, we find instructive the line of

cases following *Portuondo* v. *Agard*, 529 U.S. 61, 64, 120 S. Ct. 1119, 146 L. Ed. 2d 47 (2000), wherein the United States Supreme Court concluded that a prosecutor's comments during summation on the "ability to fabricate that [the defendant's presence during trial] afforded him"[26] did not "violate his [s]ixth [a]mendment right to be present at trial and to be confronted with the witnesses against him . . . and his [f]ifth and [s]ixth [a]mendment rights to testify on his own behalf . . . ."[27] (Citations omitted.) The Supreme Court emphasized in *Portuondo* that "inferring opportunity to tailor from presence is inevitable, and prohibiting that inference (while simultaneously asking the jury to evaluate the veracity of the defendant's testimony) is demanding the impossible . . . ." Id., 68 n.1. The court summarized by stating that it saw "no reason to depart from the practice of treating testifying defendants the

---

[26] In *Portuondo*, wherein the defendant had claimed at trial that the victim and her friend both lied in their testimony about the sexual assault, the prosecutor's summation "similarly focused on the credibility of the witnesses," and, "over defense objection . . . remarked:

" 'You know, ladies and gentlemen, *unlike all the other witnesses in this case the defendant has a benefit and the benefit that he has, unlike all the other witnesses*, is he gets to sit here and listen to the testimony of all the other witnesses before he testifies. . . .

" 'That gives you a big advantage, doesn't it. You get to sit here and think what am I going to say and how am I going to say it? How am I going to fit it into the evidence? . . .

" 'He's a smart man. I never said he was stupid. . . . He used everything to his advantage.' " (Emphasis added.) *Portuondo* v. *Agard*, supra, 529 U.S. 63–64.

[27] In so concluding, the Supreme Court distinguished *Griffin* v. *California*, 380 U.S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965), which held unconstitutional a jury instruction permitting the jury to consider the defendant's failure to testify at trial as "tending to indicate the truth of the prosecution's case." *Portuondo* v. *Agard*, supra, 529 U.S. 65. The court stated that it "is one thing (as *Griffin* requires) for the jury to evaluate all the other evidence in the case without giving any effect to the defendant's refusal to testify; it is something else (and quite impossible) for the jury to evaluate the credibility of the defendant's testimony while blotting out from its mind the fact that before giving the testimony the defendant had been sitting there listening to the other witnesses." Id., 68.

same as other witnesses. A [witness'] ability to hear prior testimony and to tailor his account accordingly, and the threat that ability presents to the integrity of the trial, are no different when it is the defendant doing the listening. Allowing comment upon the fact that a defendant's presence in the courtroom provides him a unique opportunity to tailor his testimony is appropriate—and indeed, given the inability to sequester the defendant, sometimes essential—to the central function of the trial, which is to discover the truth." Id., 73.

We followed *Portuondo* in *State* v. *Alexander*, 254 Conn. 290, 755 A.2d 868 (2000), which is particularly apt given that the prosecutor therein emphasized that the defendant was not subject to the sequestration order that applied to all other witnesses in the case. In *Alexander*, the prosecutor argued during summations: " 'Who is best able to fabricate a complicated story designed to sway a jury? Your final decision must ultimately be based on whom you believe. The victim . . . or the defendant . . . . Now, you may recall that all the witnesses were sequestered. And, that was so they couldn't hear what the other witnesses were saying so they couldn't tailor their testimony to each other's testimony. So that they couldn't contradict each other. *But there was one witness who wasn't sequestered. There was one witness who heard everything.* And, that was [the defendant], who has a built-in bias in the outcome of this case by virtue of the fact that he's the defendant.' In rebuttal to the defendant's closing argument, the prosecutor added: 'When you consider the credibility of the defendant's testimony, keep in mind that of all the witnesses here, he's the most obviously biased and interested one. He's the one who has the motive to distort the truth and fabricate the story. Think about it.' " (Emphasis added.) Id., 295. We concluded that, in making this argument, "the prosecutor violated no federal constitutional rights by commenting on the

defendant's presence at trial and his accompanying opportunity to fabricate or tailor his testimony."[28] Id., 300.

In the present case, given that Clapp, as a defense *witness*, does not have the confrontation or presence rights afforded a criminal defendant, we conclude that the prosecutor's neutrally phrased questions of Clapp during cross-examination were well within the bounds of permissible advocacy under *Portuondo*. See *Richardson* v. *Balicki*, United States District Court, Docket No. 07-5519 (RBK), 2008 U.S. Dist. LEXIS 84854, *22 (D.N.J. October 18, 2008) ("in light of the holding of *Portuondo* that examination or commentary on the issue of credibility is not improper even with respect to the criminal defendant witness, the questioning of [the nonparty witness] was entirely proper"); *State* v. *Martin*, 151 Wn. App. 98, 107, 210 P.3d 345 (2009) (extending *Portuondo* to cross-examination questions about defendant's opportunity to fabricate or tailor testimony), review granted, 168 Wn. 2d 1006, 226 P.3d 781 (2010); see *State* v. *Martin*, supra, 116 (declining to reject *Portuondo* as matter of state constitutional law); see also *United States* v. *Morris*, 837 F. Sup. 726, 727 n.2 (E.D. Va. 1993) ("[I]n hotly contested cases where witnesses give conflicting testimony . . . lawyers often suggest, implicitly or explicitly, either in their arguments or their questions, that the testimony of a witness is fabricated or tailored. This practice is understandably distasteful to some and is of doubtful efficacy, but it violates no rule or canon."). Thus, in his cross-

---

[28] In relying on *Portuondo*, we also overruled our decision to the contrary "in *State* v. *Cassidy*, 236 Conn. 112, 127–28, 672 A.2d 899, cert. denied, 519 U.S. 910, 117 S. Ct. 273, 136 L. Ed. 2d 196 (1996), in which we held that a defendant's sixth amendment right to be present at trial is violated when a prosecutor refers to a defendant's general opportunity to tailor his testimony to coincide with that of other witnesses." *State* v. *Alexander*, supra, 254 Conn. 295–96; see also id., 296 n.9 (rejecting, without detailed analysis, defendant's state constitutional claim on this issue).

examination of Clapp, the prosecutor did not do anything beyond expected trial practice with respect to a witness—defendant or otherwise—who had the opportunity to listen to the trial testimony of others, and we conclude that the trial court, therefore, did not abuse its discretion by permitting the prosecutor to ask those questions and comment on the answers during summation.

Furthermore, we conclude that the prosecutor's remarks during summation, even if they are assumed to extend beyond advocacy permissible under *Portuondo* v. *Agard,* supra, 529 U.S. 67–68, to become an inappropriate emphasis on the "urban myth that unscrupulous defense attorneys resort to unsavory tactics and cheating to secure acquittals for unworthy, guilty clients,"[29] did not deprive the defendant of a fair trial. Although the defendant noted at oral argument before this court that he did not argue this case as one of prosecutorial impropriety because of the trial court's imprimatur on the prosecutor's response to Clapp's presence in the courtroom, we nevertheless find helpful the well established multifactor analysis of *State* v. *Williams,* 204 Conn. 523, 540, 529 A.2d 653 (1987), under which we consider whether prosecutorial impropriety deprived a defendant of a fair trial. Under the *Williams* factors, "we consider: (1) the extent to which the [impropriety] was invited by defense conduct or argument; (2) the severity of the [impropriety]; (3) the frequency of the [impropriety]; (4) the centrality of the [impropriety] to the critical issues in the case; (5) the strength of the curative measures adopted; and (6) the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Tomas D.,* 296 Conn. 476, 513–14 n.43, 995 A.2d 583 (2010).

---

[29] See, e.g., *State* v. *Outing,* supra, 298 Conn. 82 ("[t]he prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel" [internal quotation marks omitted]).

Applying the various *Williams* factors, we conclude that the defendant invited the impropriety by virtue of his request for a unilateral sequestration order and his remarks suggesting that VJ changed his account upon his consultations with the prosecutor. We also note that the impropriety occurred only once during the summation and, indeed, was not especially severe given that arguments about defense witnesses' opportunities to fabricate testimony generally are permissible under *Portuondo* v. *Agard,* supra, 529 U.S. 67–68. We further note that the defendant failed to object to the prosecutor's remarks, thus indicating that he did not view them as grossly improper or necessitating the imposition of specific curative measures by the trial court, which accordingly were not imposed. See *State* v. *Tomas D.,* supra, 296 Conn. 515–16.

Moreover, the prosecutor's remarks do not involve a central issue in the case, as they pertain to the somewhat collateral question of VJ's credibility, rather than that of the victim. Indeed, although VJ testified at trial that he only saw through the gap the victim naked on the floor atop the pillows, his statement to the police indicated that he observed through the gap the defendant digitally penetrating the victim's anus, and the defendant was acquitted of the anally-based sexual assault charge. See the text accompanying footnote 23 of this opinion. Moreover, even if the summation "reduc[ed] [Clapp's] credibility to zero," we note that there was a difference of only nine inches between the visibility measurements taken by Clapp and Clark, the police detective. Given that there was no evidence presented regarding where the pillows were located within the room when VJ made his observations, it is not at all clear that believing Clark's testimony instead of Clapp's would have any effect on the plausibility of VJ's testimony.

Finally, this was by no means a weak case for the state. The separate matter of the victim's credibility was independently corroborated by the medical and constancy of accusation testimony, R's testimony that he had seen in the victim's possession very large sums of money for a child; see footnote 6 of this opinion; and the victim's testimony about the pornographic movies that she had watched in the defendant's room. See *State* v. *Tomas D.*, supra, 296 Conn. 516–17. Further, we disagree with the defendant's claim, advanced at oral argument before this court, that the split verdict, acquitting the defendant of charges arising from anal intercourse and cunnilingus, but convicting him on the other counts, demonstrates the weakness of the state's case and prejudice to the defendant from the impropriety. In the absence of reports of deadlock, which did not occur in this case, our "cases have relied on split verdicts as evidence that a jury was not so prejudiced by prosecutorial impropriety that it could not treat the defendant fairly." *State* v. *Angel T.*, 292 Conn. 262, 294 n.27, 973 A.2d 1207 (2009); see also, e.g., *State* v. *Tomas D.*, supra, 517 ("there was no deadlock to indicate that the present case was a close one in the jury's eyes"); *State* v. *Ancona*, 270 Conn. 568, 618, 854 A.2d 718 (2004) ("the fact that the jury reviewed each charge separately and found the defendant guilty of some charges but not others strongly suggests that the jury discharged its responsibilities without regard to the improper comments of the [prosecutor]"), cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005). Accordingly, to the extent that there was any impropriety in the prosecutor's remarks, we conclude that it was not sufficiently prejudicial as to require reversal of the conviction.

## IV

Finally, the defendant claims that the trial court violated his constitutional rights to due process and to

notice of the charges against him by giving the jury a supplemental instruction that the state could prove vaginal penetration by proving that the defendant had penetrated only the victim's labia majora. The defendant contends that this supplemental instruction thus had the improper effect of "enlarg[ing] the charged offenses factually" in relation to the operative information, which specifically charged the defendant with penetration of the victim's vagina. In response, the state asserts that the trial court's supplemental jury instructions did not improperly enlarge the scope of the information because they were consistent with the statutory definition of vaginal intercourse under § 53a-65 (2); see footnote 4 of this opinion; as explained by the line of decisions beginning with *State* v. *Albert*, supra, 252 Conn. 805–806, which defined the statutory term "penetration." We agree with the state and conclude that the trial court's supplemental jury instructions did not improperly enlarge the operative information.

The record reveals the following additional relevant facts and procedural history. The operative information alleged, in relevant part, that the defendant: (1) "engaged in sexual intercourse, to wit: digital-vaginal penetration, with the [victim], and that the [victim] was under thirteen years of age and the defendant was more than two years older"; and (2) "engaged in sexual intercourse, to wit: penile-vaginal penetration, with the [victim], and that the [victim] was under thirteen years of age and the defendant was more than two years older."[30]

After the close of evidence and summations, the trial court instructed the jury. With respect to that court's instructions about the elements of counts one and two, sexual assault in the first degree by digital-vaginal pene-

---

[30] The information also charged the defendant with, inter alia, sexual intercourse by "penile-anal penetration . . . ." The jury found the defendant not guilty of that charge. Thus, the initial and supplemental jury instructions with respect to that charge are not at issue in this appeal.

tration and penile-vaginal penetration, respectively, the trial court defined sexual intercourse as "digital-vaginal penetration, or the insertion of one or more fingers into the vaginal opening of another," and "penile-vaginal penetration, or the insertion of the penis into the vaginal opening of the [victim]." For each count, the trial court also instructed the jury that "[p]enetration, however slight, is sufficient to complete" the intercourse.

The following day, during deliberations, the jury sent the trial court a note requesting clarification of the meaning of the word "penetration . . . ." Specifically, the jury wrote: "The jury would like to replay portions of [Berrien's] testimony, where the definitions of penetration, both vaginally and anally, were provided. If not available in that context, can the court provide us with such a definition?" The following morning, after reviewing the court monitor's recording and confirming that Berrien had not defined penetration in his testimony, and over the defendant's objection,[31] the trial court instructed the jury on the ordinary meaning of the term penetration and, further explained that,[32] "[f]or

[31] The defendant argued that this supplemental instruction, as proposed by the trial court, would be prejudicial because he had taken the original jury instruction into account in preparing his defense, including his cross-examination of Berrien about the likelihood of injury if the victim's vagina had in fact been penetrated.

[32] The trial court's complete response to the jury's note stated that "the issue that you seem to be addressing is what is meant by the term 'penetration' as it relates to certain counts of the information. The definition of penetration does not and did not come from [Berrien].

"His testimony included, amongst other things, observation he made during the physical examination of the [victim], and the conclusions which he reached as a result of that examination, and the information of which he was aware.

"He also provided testimony regarding the structure of the female genitals. Of course, it is your recollection of [Berrien's] testimony that controls, not mine. That said, I'm going to provide you with a supplemental instruction regarding the definition of penetration. . . .

"For definitional purposes, I refer you back to those counts alleging forms of sexual assault in the first degree, which include, amongst their elements, a requirement of penetration. . . .

purposes of vaginal intercourse, either digitally, by the use of one or more fingers, or through the use of the penis, the state need not prove penetration of the vagina, but rather, penetration of the labia majora.

"The labia majora are defined as the outer fatty folds bounding the vulva. Thus, the labia majora form the boundaries of a fissure or opening associated with the female genitals. Therefore, as to the first count, if any portion of the finger passes into or through or extends into the interior of the labia majora, that would constitute penetration.

"Similarly, as to the second count, if any portion of the penis passes into or through or extends into the interior of the labia majora, that would constitute penetration."

Acknowledging that the trial court's supplemental jury instruction is a correct statement of the law as explained in *State* v. *Albert*, supra, 252 Conn. 806, the defendant nevertheless contends that it improperly enlarged the offenses charged in the operative information, thus violating the guarantees under "[t]he sixth amendment to the United States constitution and article

"For purposes of the four counts which do require penetration, the term 'penetration' is intended to have its ordinary meaning.

"And I will provide that meaning to you now. 'Penetration' is defined as the act or process of penetrating, and 'penetrate' means to pass into or through or to extend into the interior of, so what does this mean in the context of the four counts in question? . . .

"For purposes of vaginal intercourse, either digitally, by the use of one or more fingers, or through the use of the penis, the state need not prove penetration of the vagina, but rather, penetration of the labia majora.

"The labia majora are defined as the outer fatty folds bounding the vulva. Thus, the labia majora form the boundaries of a fissure or opening associated with the female genitals. Therefore, as to the first count, if any portion of the finger passes into or through or extends into the interior of the labia majora, that would constitute penetration.

"Similarly, as to the second count, if any portion of the penis passes into or through or extends into the interior of the labia majora, that would constitute penetration."

first, § 8, of the Connecticut constitution . . . [that] a criminal defendant [has] the right to be informed of the nature of the charge against him with sufficient precision to enable him to prepare his defense and to avoid prejudicial surprise . . . ." (Internal quotation marks omitted.) *State* v. *Marra*, 222 Conn. 506, 527, 610 A.2d 1113 (1992). "The function of an accusatory pleading such as an information is to inform a defendant of the nature and cause of the accusation as required by our federal and state constitutions. U.S. Const., amend. VI; Conn. Const., art. I § 8." (Internal quotation marks omitted.) *State* v. *Belton*, 190 Conn. 496, 501, 461 A.2d 973 (1983). "[That] the offense should be described with sufficient definiteness and particularity to apprise the accused of the nature of the charge so he can prepare to meet it at his trial . . . are principles of constitutional law [that] are inveterate and sacrosanct." (Internal quotation marks omitted.) *State* v. *Vumback*, 263 Conn. 215, 222, 819 A.2d 250 (2003).

More specifically, "enlargement cases involve claims that the trial court expanded the state's information by instructing the jury on statutory or factual alternatives not charged in the information. . . . It is incumbent upon the defendant in an enlargement case to demonstrate that the trial court's charge caused him unfair surprise or prejudiced him in the preparation of his defense." (Citations omitted.) *State* v. *Lemoine*, 39 Conn. App. 657, 664–65, 666 A.2d 825 (1995). In other words, the defendant must show that: (1) the challenged jury instructions improperly enlarged the charges brought against him; and (2) such enlargement was prejudicially harmful. The defendant's enlargement claims, like other claims that jury instructions violated a constitutional right, require us to exercise plenary review as we examine the charge as a whole to determine whether it misled the jury. See, e.g., *State* v. *Collins*, 299 Conn. 567, 598–99, 10 A.3d 1005 (2011).

The defendant initially contends that the trial court, by instructing that the state "need not prove penetration of the vagina, but rather, penetration of the labia majora," drastically expanded the charges against him. We disagree. In *State* v. *Albert*, supra, 252 Conn. 806, we interpreted § 53a-65 (2) and concluded that the statutory provision " '[p]enetration, however slight' . . . was intended to cover penetration of the labia majora." (Citation omitted.) We further concluded that "the opening between the . . . labia majora . . . is the genital opening . . . that the labia majora form the boundaries of the genital opening . . . [and] that digital penetration, however slight, of the *labia majora* is sufficient penetration to constitute vaginal intercourse under § 53a-65 (2)."[33] (Emphasis in original.) Id., 809. Thus, under *Albert*, "for purposes of first degree sexual assault by vaginal intercourse, the state need not prove penetration of the vagina, but, rather, penetration of the labia majora." *State* v. *Scott*, 256 Conn. 517, 534, 779 A.2d 702 (2001). Subsequent decisions repeatedly have reaffirmed and applied this conclusion. See, e.g., *State* v. *Merriam*, 264 Conn. 617, 630, 835 A.2d 895 (2003); *State* v. *Scott*, supra, 534; *State* v. *Juan V.*, 109 Conn. App. 431, 449, 951 A.2d 651, cert. denied, 289 Conn. 931, 958 A.2d 161 (2008). Thus, the judicial gloss applied by this court in *Albert* necessarily gave notice to the defendant that penetration of the vagina, as charged in the information, also included penetration of the labia majora, and, for purposes of the definition of sexual intercourse under § 53a-65 (2), the two acts

[33] Our conclusion in *Albert* was based in part on the common law "least-penetration doctrine," as first explained in *State* v. *Shields*, 45 Conn. 256 (1877). "In *Albert*, we concluded that the public policy underlying our holding in *Shields*, namely, that the least penetration of the body is sufficient to commit rape, was to protect victims from unwanted intrusions into the interior of their bodies [and that] [t]he legislature endorsed this public policy through its codification of the phrase [p]enetration, however slight in § 53a-65 (2)." (Internal quotation marks omitted.) *State* v. *Scott*, 256 Conn. 517, 534, 779 A.2d 702 (2001).

are one and the same.[34] See *State* v. *Holness*, 289 Conn. 535, 544, 958 A.2d 754 (2008) (defense counsel presumed to be aware of case law); *State* v. *Cobb*, 251 Conn. 285, 439, 743 A.2d 1 (1999) ("the statutory language, taken together with its judicial gloss, must give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" [internal quotation marks omitted]), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000). Accordingly, we conclude that the information properly placed the defendant on notice that penetration of the labia majora fell within the scope of digital-vaginal and penile-vaginal penetration and, accordingly, that the trial court's supplemental jury instruction did not improperly expand the charges with which he was charged.[35]

---

[34] The defendant raises a separate claim that the supplemental instruction was incorrect as a matter of law, and invites us to reconsider our interpretation of § 53a-65 (2) in *State* v. *Albert*, supra, 252 Conn. 795. We acknowledge that the defendant briefed this claim somewhat summarily in order to preserve his future appellate options, given that he anticipated this appeal being heard in the Appellate Court in the first instance. Nevertheless, the defendant, while he devotes several pages of briefing to this claim, does not even acknowledge or mention the various unique considerations that attend to the stare decisis effect of judicial decisions interpreting statutes. See, e.g., *State* v. *Salamon*, 287 Conn. 509, 519–25, 949 A.2d 1092 (2008) (discussing "tenet of statutory interpretation that counsels against overruling case law involving our construction of a statute if the legislature reasonably may be deemed to have acquiesced in that construction"). Accordingly, in the absence of adequate briefing addressing the stare decisis considerations attendant to overruling *Albert*, we decline the defendant's invitation to do so.

[35] We further disagree with the defendant's reliance on *State* v. *Albert*, supra, 252 Conn. 795, for the proposition that amendment of the information was necessary. In *Albert*, the trial court permitted the state to amend the information to state that the defendant was charged with " 'penetrating the labia majora of the genitalia' " of the victim. Id., 800–801. The defendant argues that this amendment gave the defendant in *Albert* notice that the state was prosecuting its case under a theory of penetration of the labia majora, as opposed to the vagina itself—notice that the defendant claims was absent in this case. We disagree. *Albert* is distinguishable because the parties therein simply did not have the benefit of an authoritative appellate decision explaining that, under § 53a-65 (2), penetration of the labia majora is legally equivalent to penetration of the vagina—a precedent that thereby

Moreover, we fail to see how the defendant was prejudiced by the supplemental instruction. His entire defense at trial was based on the theory that the victim was a habitual liar and that she and the prosecution's witnesses had fabricated the charges against him because the victim wanted the defendant out of her home. Thus, had the jury accepted the defense theory, thereby indicating that it did not believe the testimony of the state's witnesses, it would have found him not guilty on all counts, regardless of the degree of alleged penetration. The defendant has not, in his briefs or at oral argument before this court, indicated how he would have tried this case differently had he been aware of the content of the trial court's supplemental instruction before trial.[36] We conclude, therefore, that the trial court's jury instructions could not have prejudiced the defendant. See *State* v. *Franko*, 199 Conn. 481, 491, 508 A.2d 22 (1986) ("there is nothing on the record to suggest that the defendant would have changed his defense in any way had the state included the 'threat of force' theory of liability in the information"); see also *State* v. *Trujillo*, 12 Conn. App. 320, 327, 531 A.2d 142 ("if

relieved the state in the present case of the need to acknowledge in the information the anatomical distinction between the two structures. Because the defendant is now presumed to be aware of the content of the statutes and any judicial gloss thereon, he cannot now claim to be prejudiced by the trial court's explanation of that very case law. See, e.g., *State* v. *Holness*, supra, 289 Conn. 544.

[36] In his reply brief, the defendant emphasizes that he relied on the victim's lack of vaginal injuries in support of his fabrication defense and to establish reasonable doubt, and that the success of this defense was negatively impacted by the state needing to prove only penetration of the labia majora, rather than the vagina. Given Berrien's testimony about deeper penetration being more likely to cause injury, the defendant likely is correct that the jury, in arriving at its verdict, may well have relied on the much shallower penetration legally required under *Albert* in reconciling the victim's allegations with her lack of injury. See also footnote 11 of this opinion. Nevertheless, the defendant still has failed to point to a specific alternate trial strategy that he would have adopted had he been aware that the state would only need to prove penetration of the labia majora, rather than the vagina itself.

the defendant's defense encompasses the uncharged theory of criminal liability as well as the charged theory, and, if believed by the jury, could lead to an acquittal under either theory, his constitutional rights have not been adversely implicated by the trial court's instruction"), cert. denied, 205 Conn. 812, 532 A.2d 588 (1987).[37]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[37] The defendant's reliance on *State* v. *Ignatowski*, 10 Conn. App. 709, 525 A.2d 542, cert. denied, 204 Conn. 812, 528 A.2d 1157 (1987), *State* v. *Trujillo*, supra, 12 Conn. App. 320, and *State* v. *Garcia*, 37 Conn. App. 619, 657 A.2d 691, cert. denied, 234 Conn. 917, 661 A.2d 97 (1995), is misplaced, as those cases are readily distinguishable. In *State* v. *Ignatowski*, supra, 713–14, following jury selection, the trial court permitted the state to amend the second information to include three new charges against the defendant. The Appellate Court held that the improper inclusion of the additional charges "could have reasonably contributed to the defendant's conviction on the three counts of sexual assault in the first degree," and, therefore, set aside the judgment of conviction with respect to those counts. Id., 717. In *State* v. *Trujillo*, supra, 324–25, although the state had specified in its bill of particulars that the defendant was being charged with only one statutory alternative under the risk of injury statute, the trial court had instructed the jury on two statutory alternatives. The Appellate Court concluded that the defendant "was prejudiced in the presentation of his defense"; id., 328–29; based on his reliance on the bill of particulars, and that the jury reasonably could have been misled by the trial court's charge. Id., 327–29. Finally, in *State* v. *Garcia*, supra, 629–33, the Appellate Court concluded that, although the trial court's instruction on an uncharged theory of criminal liability prejudiced the defendant, the jury could not have been misled based on the arguments and evidence presented at trial, and, thus, there was no constitutional violation. In contrast to each of these cases, in the present case, the trial court's supplemental jury instruction did not expand or enlarge the original charges or add any additional charges, and thus did not prejudice the defendant, because the state's original charges of vaginal penetration *necessarily included penetration of the labia majora* as a matter of law. See, e.g., *State* v. *Albert*, supra, 252 Conn. 805–806.